98 F.3d 1530
 65 USLW 2315, 113 Ed. Law Rep. 1085
 Andrew J. MULLER, a minor child, by his parents and next
friends, Ronald G. MULLER and Ann H. Muller,
Plaintiffs-Appellants,
v.
JEFFERSON LIGHTHOUSE SCHOOL, Racine, Wisconsin, Steven
Miley, in his official capacity as Principal of Jefferson
Lighthouse School, Racine, Wisconsin, and Racine Unified
School District, Racine, Wisconsin, Defendants-Appellees.
 Nos. 95-3384, 95-3482.
 United States Court of Appeals,
Seventh Circuit.
 Argued March 26, 1996.
Decided Oct. 30, 1996.
 
 Frederick Herbert Nelson, Mathew D. Staver, argued, Nicole A. Kerr, Staver & Associates, Orlando, FL, for Andrew J. Muller, Ronald G. Muller and Ann H. Muller.
 Dayten P. Hanson, Linda Stover Isnard, Gilbert J. Berthelsen, Terrance L. Kallenbach, argued, Capwell and Berthelsen, Racine, WI, for Jefferson Lighthouse School, Steven Miley and Racine Unified School District.
 Before ESCHBACH, MANION, and ROVNER, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 Fourth-grader Andrew Muller requested from his elementary school's principal permission to hand out at school invitations to a religious meeting to be held at the church his family attends. After some dispute as to who had responsibility, the principal ultimately said no, basing his decision on the terms of the school district's Code of Student Responsibilities and Rights. The Mullers sued in federal court for declaratory and injunctive relief, claiming the school district's Code violated the constitution, most notably Andrew's rights under the free speech and free exercise of religion clauses of the First Amendment. The district court declared the elementary school a non-public forum and upheld the facial validity of all of the challenged Code provisions except a requirement that the handout contain a statement disclaiming school endorsement. We reverse the district court only on its decision on the disclaimer and otherwise affirm.
 
 I.
 
 2
 Andrew Muller attends Jefferson Lighthouse Elementary School, one of 23 elementary schools in the Racine Unified School District in Racine, Wisconsin. On January 19, 1995, Andrew, then in fourth grade, asked his teachers for permission to hand out invitations to a meeting of a group called AWANA ("Approved Workmen Are Not Ashamed"[1]) being held at his church. AWANA members meet throughout the country for small group Bible studies and Christian fellowship. The Mullers consider the extension of such invitations an "effort to evangelize for the Gospel of Jesus Christ" and "an exercise of sincerely-held beliefs." According to the Mullers, Andrew sought only to distribute the invitations during non-instructional times. But the record indicates Andrew's teacher and principal may have thought (initially at least) that Andrew wanted permission to hand out the fliers during class.
 
 
 3
 Andrew's teachers sent him to the principal's office to obtain permission. According to the Mullers, the principal, defendant Steven Miley, told Andrew he could not distribute the invitations because they were religious. Defendants deny this. They maintain Miley told Andrew he could not distribute the AWANA fliers to his class because they were neither school-supported nor directly related to school programs. According to defendants, the next morning at 8:00 a.m. Miley received a telephone call from a representative of a group in Florida called "Liberty Counsel" (now the Mullers' attorneys) inquiring about the school and the district's policies regarding distribution of religious materials. Miley referred the caller to Frank Osimitz, Director of School Operations at the district's central office, and to Frank Johnson, the district's legal counsel. Miley received a similar call from Liberty Counsel on February 3, 1995.
 
 
 4
 The Mullers claim that Ann Muller, Andrew's mother, contacted Miley to clarify whether her son could distribute the invitations. Miley referred her to Osimitz at the district office, allegedly stating "I won't let Frank [Osimitz] pass this one back on my lap." But pass Osimitz did. On January 27, 1995, Mrs. Muller called Osimitz but was told the matter lay with principal Miley. Mrs. Muller returned to Miley's office on February 6, 1995 and inquired into the school's policy regarding materials like the AWANA flier. Miley asked about the contents of the flier and was given a copy. The parties differ as to what happened next.
 
 
 5
 According to defendants, Miley told Mrs. Muller that if the material was not related to a school program, a student could not hand the information out to his class. Mrs. Muller told Miley that her son received points in the AWANA group for bringing guests to its meetings but that previous guests had not anticipated the Christian nature of the program. The fliers would help prevent confusion by clarifying the nature of the activity. Miley said Andrew could give fliers to several of his friends but that he could not distribute them to his entire class. Asked what would have happened if Andrew had passed out the fliers without permission, Miley allegedly responded that nothing would have occurred since he likely would not have known, but that if he had found out he would have told Andrew he should have obtained permission first and should do so in the future. Miley also informed Mrs. Muller that she could pursue the matter further with Osimitz or Frank Johnson (district counsel) at the district office. Defendants claim that on February 9 or 10, 1995, Mrs. Muller left a telephone message on Miley's answering machine requesting his policy on distributing materials and a written response to Andrew's request. In a letter dated February 10, 1995, Miley responded, stating it was his "policy that materials distributed at Jefferson Lighthouse School would relate to Jefferson Lighthouse School projects and programs," but also granting permission for Andrew to distribute information to "specific friends."
 
 
 6
 The Mullers tell a somewhat different story. They claim that at his office on February 6, 1995, Miley said he would like to allow Andrew to distribute his invitation but could not because he would be forced to allow distribution of materials from other churches, which he did not want. Mrs. Muller asked Miley why, in that case, parents were allowed to receive information from the YMCA, Boy Scouts, Skatetown, and other sources. Miley said those distributions had been approved by the district's central office and again referred Mrs. Muller to Frank Osimitz. Mrs. Muller indicated she had already spoken to Osimitz and had been told it was Miley's call whether to allow distribution of literature at the school. Miley disagreed, saying it was actually Osimitz's decision because all distributions not concerned with school business had to receive approval from the central office. Miley said he did not want to allow distribution of the invitation but that it would ultimately be up to Osimitz. He was concerned that if he allowed Andrew to distribute his fliers, "ten other churches" would want similar privileges. According to the Mullers, the next day Mrs. Muller again went to see Osimitz at the central office. Osimitz told her it was not his problem and that he would only get involved if the distribution concerned the whole district rather than one school. Mrs. Muller learned that Miley had contacted Chuck Melcher, the school's curriculum and instruction department head, and that Melcher had in turn contacted Osimitz about the matter but he had refused to decide the issue. She also learned that Melcher had contacted Frank Johnson of the district's legal department. Osimitz then asked Mrs. Muller for a copy of the invitation to give to Johnson for review. Osimitz said Johnson would contact her within a week or two, but the Mullers claim he never did. Two days later, Mrs. Muller again visited Miley seeking permission. According to the Mullers, Miley told her it was his position that Andrew's invitation did not deal with Jefferson Lighthouse School and thus required permission from Osimitz. Miley allegedly said everything would have been fine if Andrew had just handed out the invitations and not been caught, and that Andrew could still distribute them to his friends provided he did not get caught. Mrs. Muller says she objected to the dishonorable message that would send to Andrew, a message contrary to the morals she and her husband were trying to instill in their son.
 
 
 7
 On February 20, 1995, Mrs. Muller sent a letter to principal Miley, which was also addressed to Osimitz and Johnson, restating her version of the events and formally objecting to the provisions of the school board's policy concerning non-school-sponsored publications. The Mullers did not file an official complaint with the district appealing the principal's decision. A formal Complaint Form is included with the Code of Student Responsibilities and Rights (the district policy governing, among other things, distribution of handbills) for appeals to the district from the decisions of principals. Instead, on April 25, 1995, the Mullers filed a complaint in federal district court against Jefferson Lighthouse School, Steven Miley as principal, and the Racine Unified School District seeking a declaratory judgment and preliminary and permanent injunctive relief. The complaint alleged that Sections 6144.11[2] and 6144.12[3] of the Racine Unified School District Code of Student Responsibilities and Rights (1994-95) on their face and as applied by Principal Miley violated Andrew's "Free Speech, Free Exercise of Religion and Equal Protection rights ... guaranteed under the First and Fourteenth Amendments to the United States Constitution and the Religious Freedom Restoration Act of 1993 and constitute a violation of the First Amendment's Establishment Clause."
 
 
 8
 Characterizing the school as a nonpublic forum, the district court applied a reasonableness standard and upheld the facial validity of all the challenged Code provisions except the requirement that a handout contain a statement disclaiming school endorsement. The court found this to be an unreasonable "regulation of the content of pure speech." The court did not resolve the discrepancies between the parties' versions of the facts. Instead the court held that whichever rendition was correct, Miley violated the First Amendment either by not adhering to the school district's own policy or by prohibiting Andrew's fliers solely because they were religious. The court issued an injunction precluding school officials from preventing Andrew from distributing the AWANA materials on those grounds.
 
 
 9
 Both parties appeal. The Mullers raise five issues: (1) whether the Code itself constitutes an unconstitutional prior restraint on speech; (2) whether the Code's requirement that student-sponsored literature be screened for insulting messages is an unconstitutional content-based restriction; (3) whether the Code's time and place restrictions for distributing student handouts irrespective of quantity are unreasonable for distributions during non-instructional times; (4) whether Hedges v. Wauconda Community Unit School Dist. No. 118, 9 F.3d 1295 (7th Cir.1993), should be overturned or modified to the extent it held that schools are nonpublic forums for student interpersonal communication and that designating locations for literature distribution of ten or more pieces is not unconstitutional; and (5) whether the Code (or at least the rationale behind it) violates the Establishment Clause. Defendants cross-appeal claiming the court erred in ruling that the disclaimer policy contained in § 6144.11(4) is facially unconstitutional. Neither party contests the court's as-applied ruling.
 
 II.
 
 10
 The first general question to explore is what speech rights elementary school children possess. To put this case in perspective, a brief historical review of the Supreme Court's approach to student speech rights is helpful.
 
 
 11
 The Supreme Court's case law addressing the First Amendment rights of high school students draws from two important but at times conflicting educational concepts. The first is the traditional view which holds that children are in the temporary custody of the state as "schoolmaster." See Vernonia School Dist. 47J v. Acton, --- U.S. ----, ----, 115 S.Ct. 2386, 2391, 132 L.Ed.2d 564 (1995). The public school is seen as an institution of nurturing authority created to inculcate learning and social and political habits and mores, thereby preparing children for meaningful lives, citizenship, and the full exercise of their constitutional rights. See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982) (plurality opinion). The school's teaching authority is important in the traditional view. The student is not yet "possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees," Tinker v. Des Moines Independent Com. School Dist., 393 U.S. 503, 515, 89 S.Ct. 733, 741, 21 L.Ed.2d 731 (1969) (Stewart, J., concurring). Under the traditional approach, the school's authority can exceed a student's free speech rights. Cf. Settle v. Dickson Cty. Sch. Bd., 53 F.3d 152, 156 (6th Cir.1995). The educational emphasis is less on present expression than on equipping the child with the tools of expression. Cf. Zykan v. Warsaw Com. Sch. Corp., 631 F.2d 1300, 1304 (7th Cir.1980) ("A high school student's lack of the intellectual skills necessary for taking full advantage of the marketplace of ideas engenders a correspondingly greater need for direction and guidance from those better equipped by experience and reflection to make critical educational choices.").
 
 
 12
 In the second concept, school children are autonomous individuals, treated as adults, entitled to free speech rights during school hours. The emphasis is on schools as expressive forums. Free speech and the "marketplace of ideas" it fosters are said to promote a wide and not entirely structured exposure to new ideas and robust debate. See Keyishian v. Bd. of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). "According to this view, education is a participatory process with maximum interaction and independent thought." Rosemary C. Salomone, Free Speech and School Governance in the Wake of Hazelwood, 26 Ga. L.Rev. 253, 258 (1992). The concern is that school authority not "strangle the free mind at its source." West Virginia State Bd. of Education v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).
 
 
 13
 At common law, school teachers and administrators stood in loco parentis over the children entrusted to them. See Acton, --- U.S. at ----, 115 S.Ct. at 2391. School children had only that amount of freedom that parents and school administrators thought best. Id. The in loco parentis doctrine remains in full force in private schools. However, its force in public schools, together with the authority/ apprenticeship model of education it embodies, has been somewhat weakened by a line of Supreme Court opinions recognizing certain student rights, especially First Amendment rights. See Acton, --- U.S. at ---- - ----, 115 S.Ct. at 2391-92 (noting limitations on school authority). The Supreme Court first recognized the free speech interests of public school students in West Virginia State Bd. of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), when it held that a compulsory flag salute exercise was an unconstitutional coercion of belief. The Court affirmed the authority and independence of school officials, noting their "important, delicate, and highly discretionary functions." Id. at 637, 63 S.Ct. at 1185. But stressing the importance of student individualism, the Court nevertheless struck down the regulation. Id.; see also id. at 641-42, 63 S.Ct. at 1186-87 (praising "intellectual individualism").
 
 
 14
 The Court first protected actual student expression in public schools in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Tinker involved high school and junior high school students who were punished for engaging in a nondisruptive, passive expression of a political viewpoint by wearing black arm bands to protest the Vietnam War. See Bethel School District v. Fraser, 478 U.S. 675, 680, 106 S.Ct. 3159, 3162, 92 L.Ed.2d 549 (1986) (discussing Tinker). In Tinker, the Court explicitly addressed the conflicting interests of school authority and student autonomy. Expressing concern about coercion of political orthodoxy and support for the "marketplace of ideas," Tinker, 393 U.S. at 507 & 511-12, 89 S.Ct. at 736 & 739-40, the Court endorsed a broad concept of student rights. Id. at 506, 89 S.Ct. at 736. The Court acknowledged the vital, at times competing, interests of school officials "to prescribe and control conduct in the schools." Id. at 507, 89 S.Ct. at 737. Still, it emphasized a view of schools as institutions of expressive individualism, id. at 512, 89 S.Ct. at 739, and found the restrictions on the students' symbolic speech unconstitutional. Id. at 514, 89 S.Ct. at 740. The Court elaborated a new test intended to affirm student expression while recognizing the unique nature of the school environment: "[A student] may express his opinions ... if he does so without materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others." Id. at 513, 89 S.Ct. at 740 (citation omitted). In dissent, Justice Black argued that the Court had transferred too much authority over students away from schools and to itself. Id. at 515, 89 S.Ct. at 741 (Black, J., dissenting). Instead of the "marketplace of ideas," Justice Black emphasized more traditional educational goals, such as keeping student minds on their classwork and inculcating self-discipline and the values of good citizenship. Id. at 518 & 524, 89 S.Ct. at 742 & 745 (Black, J., dissenting).
 
 
 15
 In Bethel School District No. 403 v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), the Court emphasized school authority, much along the lines of Justice Black's dissent in Tinker. Fraser involved a racy (though not technically obscene) nominating speech at a voluntary high school assembly held during school hours as part of a school-sponsored student government program. Some students liked the speech, some were "bewildered and embarrassed," id. at 678, 106 S.Ct. at 3162, but the record contained no finding that the speech caused any meaningful disruption, and no one claimed the speech invaded the rights of others-the two criteria under Tinker for suppression of student speech. Nevertheless, the Court upheld the decision of school authorities to punish the student speaker and issued an opinion strongly stressing an inculcative and even parental vision of public education: " '[P]ublic education must prepare pupils for citizenship in the Republic.... It must inculcate the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation.' " Id. at 681, 106 S.Ct. at 3163 (quoting C. Beard & M. Beard, New Basic History of the United States 228 (1968)). These "habits and manners of civility" must "take into account consideration of the sensibilities of others, and, in the case of a school, the sensibilities of fellow students." Id. at 681, 106 S.Ct. at 3163. The Court acknowledged a freedom interest in "advocat[ing] unpopular and controversial views," but said it "must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior." Id. Since "the constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings," id. at 682, 106 S.Ct. at 3164, schools are free to insist "that certain modes of expression are inappropriate and subject to sanction," for "[t]he inculcation of these values is truly the 'work of the schools.' " Id. at 683, 106 S.Ct. at 3164 (quoting Tinker, 393 U.S. at 508, 89 S.Ct. at 737). The Court also stressed the importance of maintaining a civil and well regulated school environment so as to "teach by example the shared values of a civilized social order." Id. at 683, 106 S.Ct. at 3164.
 
 
 16
 The Court in Fraser distinguished the "political viewpoint" at issue in Tinker from the type of speech before it. Id. at 685, 106 S.Ct. at 3165 (emphasis added). Age was also an important factor in the Court's holding in Fraser. The Court stressed the vulnerability of a "less mature audience" (some "only 14 years old") to offensive speech. Id. at 683-85, 106 S.Ct. at 3164-65. Supreme Court precedent, the Court said, confirms that parents may legitimately expect schools acting on their behalf to protect their children from such speech: "[Our cases] recognize the obvious concern on the part of parents, and school authorities acting in loco parentis, to protect children--especially in a captive audience--from exposure to sexually explicit, indecent, or lewd speech." Id. at 684, 106 S.Ct. at 3165.
 
 
 17
 The Court repeated Fraser's more deferential approach to the authority of educators in Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), in which a principal removed before publication articles in a high school student newspaper addressing students' experiences with pregnancy and the impact of divorce on students at the school. Addressing the constitutionality of this action, as it had done previously, the Court again acknowledged the competing interests of educational authority and student speech rights, but emphasized that "[a] school need not tolerate student speech that is inconsistent with its basic educational mission." Id. at 266, 108 S.Ct. at 567 (citations and internal quotation marks omitted).
 
 
 18
 Key to the holding in Hazelwood, and ultimately to our holding here (see infra III.A.), was an initial determination of the type of forum at issue. When is a school a public forum? The Court answered that "school facilities may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public,' or by some segment of the public, such as student organizations." Id. at 267, 108 S.Ct. at 568 (citing Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 46 n. 7 & 47, 103 S.Ct. 948, 955 n. 7, 956, 74 L.Ed.2d 794 (1983)). A public forum is not created by default, only by design: " 'The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.' " Hazelwood, 484 U.S. at 267, 108 S.Ct. at 568 (quoting Cornelius v. NAACP Legal Defense & Educational Fund, Inc., 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985)). Speech in nonpublic forums is subject to significantly greater regulation than speech in traditional public forums.[4] Thus, where school facilities have been "reserved for other intended purposes, 'communicative or otherwise,' " and no public forum has been created, "school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." Hazelwood, 484 U.S. at 267, 108 S.Ct. at 567 (emphasis added); Perry, 460 U.S. at 46 n. 7, 103 S.Ct. at 955 n. 7. The Court's test now is whether the restrictions are "reasonably related to legitimate pedagogical concerns." Hazelwood, 484 U.S. at 273, 108 S.Ct. at 571. Reviewing the facts of the case, the Court held that the school paper was a nonpublic forum. Id. at 270, 108 S.Ct. at 569. It then conducted a rational basis analysis and concluded that the principal's actions were constitutional. Id. at 274-76, 108 S.Ct. at 571-73.[5]
 
 
 19
 The Supreme Court has not expressly considered whether the free expression rights first announced in Tinker extend to grade school children. Tinker and its progeny dealt principally with older students for whom adulthood and full citizenship were fast approaching. The Court has not suggested that fourth-graders have the free expression rights of high school students. See Baxter v. Vigo County School Corp., 26 F.3d 728, 737-38 (7th Cir.1994). In Hedges v. Wauconda Community School Dist. 118, 9 F.3d 1295, 1298 (7th Cir.1993), we acknowledged the religious speech rights of junior high school students, noting that "nothing in the First Amendment postpones the right of religious speech until high school." But the environment of an elementary school was not at issue in that case. The parties have not directed us to, and our research does not reveal, any decisions of the Courts of Appeals applying Tinker-based speech rights to the elementary school setting.[6]
 
 
 20
 Age is a critical factor in student speech cases, as the Supreme Court has indicated and as we noted in Baxter, 26 F.3d at 737-38. If a high school can suppress speech to protect 14-year-olds from sexual innuendo at a voluntary school assembly (Fraser), and if it can delete entire pages from a school newspaper because they touch on "sensitive topics" (Hazelwood, 484 U.S. at 272, 108 S.Ct. at 570) it follows that a public elementary school can shield its five through thirteen-year-olds from topics and viewpoints that could harm their emotional, moral, social, and intellectual development. The "marketplace of ideas," an important theme in the high school student expression cases, is a less appropriate description of an elementary school, where children are just beginning to acquire the means of expression.[7] Grammar schools are more about learning, including learning to sit still and be polite, than about robust debate. And yet we have held that religious speech cannot be suppressed solely because it is religious (as opposed to religious and disruptive or hurtful, etc.), a principle that makes sense in the elementary school environment. See Hedges, 9 F.3d at 1297-98. Tinker may still stand for the similar proposition that student political speech cannot be suppressed solely because it is political.
 
 
 21
 This review of Supreme Court precedent reveals the current state of student speech rights. In sum, since Tinker, students retain First Amendment rights, but "the nature of those rights is what is appropriate for children in school" where the government as educator discharges its "custodial and tutelary responsibility for children." Acton, U.S. at ----, 115 S.Ct. at 2392. Especially considering the important role age plays in student speech cases, see Baxter, 26 F.3d at 737-38, it is unlikely that Tinker and its progeny apply to public elementary (or preschool) students. But because the Supreme Court has not directly decided this question, the following analysis will assume that grade schoolers partake in certain of the speech rights set out in the Tinker line of cases. With this background, we turn to the Mullers' claims.
 
 III.
 A. Forum Analysis
 
 22
 As noted above, Hazelwood stressed the importance of determining whether a public or nonpublic forum is at issue. Thus, we begin by analyzing what kind of forum this public elementary school is. See Hazelwood, 484 U.S. at 267, 108 S.Ct. at 567. The district court concluded that Jefferson Lighthouse Elementary School is a nonpublic forum subject to reasonable restrictions on speech. Despite the Supreme Court's strong support for the discretion of educators, and despite recent case law from this circuit holding that a junior high school is a nonpublic forum, the Mullers challenge the district court's conclusion.
 
 
 23
 "[S]chool facilities may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public' [citation omitted] or by some segment of the public, such as student organizations." Id. In Hedges, we held that a "junior high school is a nonpublic forum, which may forbid or regulate many kinds of speech," including non-school sponsored literature. 9 F.3d at 1302. The same is true a fortiori of a public elementary school where, with even younger children, the need for structuring the educational environment is that much greater. Nothing in the record suggests Jefferson Lighthouse Elementary School has been opened to anyone for "indiscriminate use." On the contrary, the complaint before us says the school is too discriminating in that it imposes significant restrictions on certain types of student expression.
 
 
 24
 The Mullers ask us to modify or overrule Hedges and declare an elementary school a public forum, or a least a limited public forum for purposes of distributing student-sponsored literature. Their argument is based mainly on this language from Tinker: "The principal use to which schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. Among those activities is personal intercommunication." Tinker, 393 U.S. at 512, 89 S.Ct. at 739. From these two sentences the Mullers contend that "[s]chools are by their very nature designated public forums and can be none other than a designated public forum by virtue of the fact that they are dedicated 'to accommodate students during prescribed hours.' " We cannot agree that this isolated sentence from Tinker was meant to carry such weight, especially in the context of an opinion simultaneously affirming "the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Id. at 507, 89 S.Ct. at 737. Student "intercommunication" is indeed important, but it is only one of many important school "activities." Classroom instruction and discipline are obviously also important. As discussed above, Supreme Court decisions since Tinker indicate that the teaching of civility and the inculcation of traditional moral, social, and political norms may override student expression, or at least that it is permissible for a school board to so order its educational priorities. Fraser, 478 U.S. at 681 & 683, 106 S.Ct. at 3163 & 3164; Hazelwood, 484 U.S. at 271-72, 108 S.Ct. at 570-71.
 
 
 25
 Further, the potential "verbal cacophony" of a public forum, see Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971), can be antithetical to the delicate "custodial and tutelary" environment of an elementary school. See Acton, --- U.S. at ----, 115 S.Ct. at 2392. The cultivation of the "habits and manners of civility" that Fraser held "essential to a democratic society," 478 U.S. at 681, 106 S.Ct. at 3163, can require a level of parent-like guidance that has no place in a public forum. Declaring the elementary school classroom, hallway, or playground forums for unfettered student communication would require either a severe incursion into the critical educational mission of the elementary school or a substantial contraction of the First Amendment protections afforded speech in a public forum. Perhaps both. But neither alteration is necessary on the facts before us. In a public forum, the Christian can tell the Jew he is going to hell, or the Jew can tell the Christian he is not one of God's chosen, no matter how that may hurt. But it makes no sense to say that the overly zealous Christian or Jewish child in an elementary school can say the same thing to his classmate, no matter the impact. Racist and other hateful views can be expressed in a public forum. But an elementary school under its custodial responsibilities may restrict such speech that could crush a child's sense of self-worth.
 
 
 26
 Even assuming Tinker expression rights apply to children in public elementary schools, an elementary school's nonpublic forum status remains, and we apply the most recent standard elaborated by the Supreme Court in Hazelwood, that of "reasonableness." The test, therefore, is whether the restrictions on student expression are "reasonably related to legitimate pedagogical concerns." Hazelwood, 484 U.S. at 273, 108 S.Ct. at 571. As the Supreme Court has stressed, such "pedagogical concerns" include not only the structured transmission of a body of knowledge in an orderly environment, but also the inculcation of civility (including manners) and traditional moral, social, and political norms. This approach is consistent with the firm principle that student rights must be construed "in light of the special characteristics of the school environment," Tinker, 393 U.S. at 506, 89 S.Ct. at 736, and that "the nature of those rights is what is appropriate for children in school." Acton, --- U.S. at ----, 115 S.Ct. at 2392. We therefore decline the Mullers' request to overrule Hedges.
 
 B. Prior Restraint
 
 27
 The Mullers argue that the district's Code of Student Responsibilities and Rights constitutes a facially unconstitutional prior restraint. The Code stipulates that a student wishing to distribute private handbills must give a copy "to the principal at least 24 hours before its distribution." The Code also requires the "written permission of the school principal or the Superintendent of Schools ... before students may distribute or display on designated bulletin boards, materials from sources outside the school." See supra, note 2.
 
 
 28
 Prior restraint of student speech in a nonpublic forum is constitutional if reasonable. Hazelwood dealt with prior restraint by a high school principal of articles to be published in a student newspaper. Deeming the newspaper a nonpublic forum, the Supreme Court engaged in a rational basis analysis and upheld the prior restraint as reasonable. 484 U.S. at 276, 108 S.Ct. at 572. Likewise, in Hedges we found no constitutional problem with a school code prohibiting entirely the general distribution of written material "which is primarily prepared by non-students." 9 F.3d at 1301. We "freely concede[d]" that "adopting the expression of others is a form of speech," id. at 1302, but held that because a "junior high school is a nonpublic forum" it "may forbid or regulate many kinds of speech" as long as such regulations "are not arbitrary or whimsical." Id. Thus, "[w]hether a school serves pupils' interests by curtailing their dissemination of leaflets prepared by third parties is not a question of constitutional law. The Constitution is not a code of education, requiring schools to adopt whatever practices judges believe will promote learning." Id. at 1301.
 
 
 29
 Prior restraint in the public school context, and especially where elementary schools are concerned, can be an important tool in preserving a proper educational environment. It may be necessary at times to prevent obscenity from reaching young students. Grade school students are generally between the ages of five and fourteen. The Supreme Court's "First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children." Fraser, 478 U.S. at 684, 106 S.Ct. at 3164-65. Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), upheld a state statute banning the sale of sexually oriented material to minors, an act of prior restraint. The Court "ha[s] also recognized an interest in protecting minors from exposure to vulgar and offensive spoken language." Fraser, 478 U.S. at 684, 106 S.Ct. at 3164 (citing FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978)). Certainly racially and religiously bigoted materials can be intercepted before they damage children and the school environment. Educators have the discretion to decide that anything promoting hate or violence will not be allowed to contaminate the (nonpublic forum) atmosphere of a public school. Where public school children are involved there is no practical way to protect students from materials that can disrupt the educational environment or even severely traumatize a child without some form of prior restraint. Of course, the leaflets Andrew sought to distribute were innocuous enough, but it could have been different. Obviously, school officials cannot know beforehand the nature of all literature students, or those acting through them, seek to distribute; and post-hoc responses to a harmful distribution cannot always undo the damage. Children in public schools are a "captive audience" that "school authorities acting in loco parentis" may "protect." Fraser, 478 U.S. at 684, 106 S.Ct. at 3164. The challenged Code provisions aim to do that by permitting the principal to prescreen for "libelous or obscene language," incitement "to illegal acts," insults "to any group or individuals," or other materials that "will greatly disrupt or materially interfere with school procedures and intrude into school affairs or the lives of others." See supra, note 2. There is nothing facially unreasonable about such restrictions.
 
 
 30
 As a related argument, the Mullers contend the Code is unconstitutional because it does not contain adequate procedural safeguards and because it fails to provide a definite time limit within which the decision to grant or deny permission will be made. We disagree. The Supreme Court has never held that a detailed administrative code is required before student speech may be regulated. The Constitution does not dictate to school authorities a precise time limit for evaluating the propriety of a proposed student handout. Discretion is in the nature of the educational process and such matters of "daily operation" are reserved to the schools. Pico, 457 U.S. at 863-64, 102 S.Ct. at 2806-07 (plurality opinion); Barnette, 319 U.S. at 637, 63 S.Ct. at 1185 (schools have "highly discretionary functions"); Hazelwood, 484 U.S. at 278, 108 S.Ct. at 573 ("public educator's task is weighty and delicate" and "demands particularized and supremely subjective choices" among educational options) (Brennan, J., dissenting). Judicial review of the educator's discretion is thus highly deferential. See Tinker, 393 U.S. at 507, 89 S.Ct. at 736.
 
 
 31
 In a nonpublic forum, only unreasonable restrictions are forbidden. How much time is reasonable for evaluating a proposed student handout will depend on the nature of the handout-its subject matter, style, and length; its intended audience; the difficulty in evaluating its educational, emotional, and legal impact on its likely recipients, the broader school environment, and the school itself; the need it creates for prophylactic restrictions to ensure the materials are distributed only to children of sufficient maturity; and so on. Other factors can affect the length of a reasonable prescreening period, such as the ability to contact a student's parents to confirm the requested distribution (especially if it is questionable), the quantity and diversity of proposed handouts, and unexpected school emergencies. Courts should not impose artificial time limits that might result in the distribution of obscene or otherwise harmful materials because a principal was out sick for a day or two, or that might unintentionally convince the school to ban (as it surely can) all student handouts rather than endure the administrative hassle. The Supreme Court's repeated emphasis on school board discretion counsels against judicial imposition of rigid deadlines or intricate procedures to deal with all contingencies. These are schools, not courts or administrative tribunals. The reasonableness of a delay in prescreening a proposed handout must be determined in a highly specific factual inquiry, not in the abstract. Thus, the Mullers' facial challenge cannot prevail.C. Content-Based Restrictions
 
 
 32
 The Mullers also attack the Code's requirement that literature be screened for insulting messages as an unconstitutional content-based restriction. This argument has no merit. Even where adults with full First Amendment speech rights are concerned, the government can reserve a nonpublic forum for the purpose for which it was created, and in so doing can censor speech on the basis of content. Thus, contrary to the Mullers' suggestion, "[t]he government can regulate content in a nonpublic forum." May v. Evansville-Vanderburgh School Corp., 787 F.2d 1105, 1113 (7th Cir.1986); Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451 ("a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum"). What the courts have not permitted is suppression of a particular viewpoint. May, 787 F.2d at 1113. Yet even that restriction is not hard and fast with public schools, especially elementary schools. The student's right to express a point of view in a public school is only as extensive as "the special characteristics of the school environment" permit. Tinker, 393 U.S. at 506, 89 S.Ct. at 736; Acton, --- U.S. at ----, 115 S.Ct. at 2392 ("the nature of [student] rights is what is appropriate for children in school"); Hazelwood, 484 U.S. at 266, 108 S.Ct. at 567 (student rights "are not automatically coextensive with the rights of adults in other settings").
 
 
 33
 Though it may not act unreasonably, a school need not tolerate student expression of viewpoints which are fundamentally "inconsistent with its basic educational mission." Id. The older student who wishes to express his belief to first-graders on the playground that the life of a drug dealer is preferable to that of the civilized citizen may be reasonably restrained; there are compelling state and human interests at stake. Pico, 457 U.S. at 864, 102 S.Ct. at 2806 (plurality opinion) (preparatory mission of public schools is "vitally important") (quoting Ambach, 441 U.S. at 76-77, 99 S.Ct. at 1594-95); Shelton, 364 U.S. at 485, 81 S.Ct. at 250 (noting state's "vital concern" in manner that a teacher "shapes the attitude of young minds towards the society in which they live"); cf. Zykan, 631 F.2d at 1304 (suitable curriculum for students "a vital and compelling interest" of the community). Even Tinker's expansive approach to student speech permitted at least some viewpoint censorship where the expression materially disrupts class work, causes substantial disorder, or invades the rights of others. Tinker, 393 U.S. at 513, 89 S.Ct. at 740. We may assume, therefore, that had the wearing of black arm bands (a viewpoint expression) sparked riots at the school, the outcome in Tinker--though not the test-would have been different.
 
 
 34
 Schools, therefore, are free to screen student handouts for material that is insulting or lewd or otherwise inconsistent with legitimate pedagogical concerns. As we said above, schools have "an interest in protecting minors from exposure to vulgar and offensive" speech, Fraser, 478 U.S. at 684, 106 S.Ct. at 3165, which includes insulting speech. Cf. Trachtman v. Anker, 563 F.2d 512, 520 (2d Cir.1977) ("a blow to the psyche may do more permanent damage than a blow to the chin") (Gurfein, J., concurring). Content regulation is permissible in the school environment; indeed, it is necessary to create a school environment. Thus, the Code's screening requirements are not per se unreasonable.
 
 
 35
 In so holding we reject the Mullers' implication that a school must spell out in intricate detail precisely what is "libelous or obscene language" or an incitement "to illegal acts" or an insult "to any group or individuals" or which materials "will greatly disrupt or materially interfere with school procedures and intrude into school affairs or the lives of others." See supra note 2. The Mullers condemn the vagueness of such language with Supreme Court cases addressing restrictions on adult expression outside the school setting. See Smith v. Goguen, 415 U.S. 566, 571, 94 S.Ct. 1242, 1246, 39 L.Ed.2d 605 (1974); Gooding v. Wilson, 405 U.S. 518, 522, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408 (1972); Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971). However, schools are different. Their duties and responsibilities are primarily custodial and tutelary and thus discretionary in nature, not legalistic. An education in manners and morals cannot be reduced to a simple formula; nor can all that is uncivil be precisely defined. What is insulting or rude very often depends on contextual subtleties. A shockingly indecorous act at the dinner table may be par for the course in the locker room or on the playground. If the schools are to perform their traditional function of "inculcat[ing] the habits and manners of civility," Fraser, 478 U.S. at 681, 106 S.Ct. at 3163, they must be allowed the space and discretion to deal with the nuances. The touchstone is reasonableness, and there is nothing facially unreasonable about the Code's content regulations.
 
 D. Time and Place Restrictions
 
 36
 The Mullers claim the Code's time and place restrictions for literature distribution irrespective of quantity are unreasonable. Again, we disagree. The Code states that "[a] time and place for the distribution [of student sponsored literature] must be set cooperatively with the principal." See supra, note 2. This makes eminent sense. "[L]ike a pig in a parlor instead of the barnyard," distribution of even appropriate literature (a good thing) at the wrong time or place can be a nuisance. Pico, 457 U.S. at 920, 102 S.Ct. at 2835 (Rehnquist, J., dissenting) (quoting Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926)). Reasonable time, place, and manner restrictions are permissible in public and nonpublic forums. Perry, 460 U.S. at 45-46, 103 S.Ct. at 954-56. Not everyone can parade down a street or stand on the public soap box at once. And not all places are appropriate for all types of expression. See United States v. Kokinda, 497 U.S. 720, 728, 110 S.Ct. 3115, 3120, 111 L.Ed.2d 571 (1990) (plurality opinion) (postal sidewalk constructed solely to facilitate traffic between parking lot and post office, not expression, and may be so reserved).[8]
 
 
 37
 The establishment of an appropriate time, place, and manner for a student to distribute fliers, even where the quantities are small, is therefore appropriate. The Mullers disagree, arguing that "[s]tudents obviously should not be prohibited from passing a love note to another student, giving that student a birthday card, or giving another directions to his or her home." But the simple response is that it depends on the time, place, and manner of the distribution. The school may reasonably prohibit distribution of love notes or birthday cards during math class; math class is for learning math, not for passing love notes or birthday cards. Prohibiting handbilling in the hallway between classes is also reasonable to avoid congestion, confusion, and tardiness, to say nothing of the inevitable clutter caused when the recipient indiscriminately discards the handout. See Hemry by Hemry v. School Bd. of Colorado Springs, 760 F.Supp. 856 (D.Colo.1991). When, where, and how children can distribute literature in a school is for educators, not judges, to decide "provided [such choices] are not arbitrary or whimsical." Hedges, 9 F.3d at 1302; see also id. at 1301 (place restrictions proper given nature of school and function of principal). Here the Code requires the student and principal to determine "cooperatively" an appropriate time and place for the distribution. This permits flexibility so that the unique needs of the school and the student can be accommodated. There is nothing a priori unreasonable about that.
 
 E. Establishment Clause
 
 38
 Finally, the Mullers challenge the Code on Establishment Clause grounds. Their argument (a preemptive one) is that defendants cannot justify the Code by claiming it is necessary to prevent entanglement with religion. The Mullers are correct that speech cannot be suppressed or discriminated against solely because it is religious. See Hedges, 9 F.3d at 1297-98, and cases cited therein. Banning religious expression, "which the Free Exercise Clause of the First Amendment singles out for protection," id. at 1298, solely because it is religious is per se unreasonable. The Supreme Court has also rejected the view that, in order to avoid the perception of sponsorship, a school may suppress religious speech. Widmar v. Vincent, 454 U.S. 263, 271-73, 102 S.Ct. 269, 275-76, 70 L.Ed.2d 440 (1981); Bd. of Education v. Mergens, 496 U.S. 226, 247-52, 110 S.Ct. 2356, 2370-73, 110 L.Ed.2d 191 (1990) (plurality opinion); Lamb's Chapel v. Center Moriches Union Free School District, 508 U.S. 384, 394, 113 S.Ct. 2141, 2148, 124 L.Ed.2d 352 (1993). On appeal, defendants do not suggest otherwise and do not attempt to justify any part of the Code by arguing it is necessary to avoid offending the Establishment Clause. The regulations in this case, which apply to religious and nonreligious distributions alike, do not implicate the Establishment Clause. Hedges, 9 F.3d at 1299.
 
 F. Disclaimer
 
 39
 Defendants cross-appeal the district court's holding that the Code provision directing that nonschool sponsored publications contain a disclaimer is unconstitutional. The Code requires this phrase: "The opinions expressed are not necessarily those of the school district or its personnel." The district court found this unreasonable as a regulation of the content of speech. However, the court found no such concern with a similar Code provision (not at issue here) requiring each publication to contain the name of the entity sponsoring the material, holding it was reasonable to vindicate the school's interest in maintaining order and control and in identifying the sponsoring groups and individuals.
 
 
 40
 It is not clear why the district court found the provision requiring disclosure of sponsorship reasonable but the provision requiring a disclaimer unconstitutional. Both require a minimal interference with the content of a handout. Neither requirement would noticeably alter the message. The absence of a disclaimer could conceivably convey to students the false impression that the school or some other organization was the publication's sponsor. Perhaps the difference between identifying sponsorship and disclaiming a connection to the school is that in some cases the sponsor would have to print the literature with the disclaimer separately, which might prevent it from distributing the literature at other locations because the disclaimer would not be relevant. But this would be a minor burden. Otherwise the disclaimer requirement is indistinguishable from the sponsorship requirement. It is simply emphasis: it underscores the fact that the school is not sponsoring the expression. That message is implicit in the requisite sponsorship statement. The disclaimer makes it explicit.
 
 
 41
 Perhaps the court's holding was in response to another argument. Defendants defended the disclaimer by contending that the regulation was necessary to avoid Establishment Clause problems, an argument they no longer advance. The court's analysis of the disclaimer was principally a rejection of the misconception that permitting distribution of religious literature on the same basis as nonreligious literature raises Establishment Clause concerns. Hedges, 9 F.3d at 1299, held it does not and defendants do not disagree on appeal. Probably because they were not emphasized, the district court did not fully consider other valid reasons for the disclaimer. As an institution of vital public concern, a school has a strong interest in clarifying to its students and the public what it does and does not endorse. That does not imply it can discriminate against religious speech (the district court's main concern), but it can surely inform others that it takes no position on the content of the expression, religious or otherwise. Nonendorsement was a central concern of both Fraser and Hazelwood. In Hazelwood it helped justify suppression of entire articles in a school newspaper. The district court recognized the school's interest in not endorsing religious expression and indicated the school could post a sign clarifying its policy. Nevertheless, the court found the disclaimer requirement unnecessary and unreasonable.
 
 
 42
 No doubt a posted sign clarifying the school's policy would be a reasonable alternative. But school administrators are not confined to those means least restrictive of student speech when they pursue legitimate educational interests. Hazelwood, where far less drastic measures could have been used, makes this clear. The means need only be reasonable. Under that test the disclaimer provision passes. It is one of many reasonable ways for the school to make clear that it does not necessarily espouse what it permits. The provision also has advantages over the posted-sign alternative. Not all who read a handout will have obtained it from the designated point of distribution. Thus, a stationary sign at the official point of distribution may leave some recipients, students or not, confused about the school's position on the expression. The affixed disclaimer keeps the reminder with the flier, better ensuring that the message is received. Such an advantage is not obtained by an unreasonable restriction on speech and is therefore permissible.
 
 
 43
 The Mullers suggest the Code could require that every personal student note and birthday card be stamped with the disclaimer. This reading is unwarranted. The Code references "Non-School-Sponsored Publications" and "handbills." Taken in context and applying nontechnical definitions, as students, parents, and principals would, these terms do not imply what the Mullers suggest. It is highly unlikely that anybody--including defendants and the Mullers--thinks of valentines and birthday invitations when contemplating the terms "nonschool-sponsored publications" and "handbills." Even if, as the Mullers insist, someone may come to that conclusion, we decline to declare the provision constitutionally unreasonable because of the potential for nonsensical readings. Constitutional jurisprudence should not be driven by the absurd possibility, especially in the context of our public schools.[9] The disclaimer requirement is not unreasonable.
 
 IV.
 
 44
 In conclusion, we express our sympathy with the Mullers' frustration at the way school officials handled this whole affair. Andrew wanted to distribute a simple flier inviting friends to a church-sponsored activity. Regrettably, the principal's evasive reaction got in the way of an accommodating resolution. Nothing in the Supreme Court's Establishment Clause jurisprudence requires such a response, and indeed the Free Exercise and Free Speech Clauses forbid it. Andrew's right not to have his expression suppressed solely because it is religious was vindicated in the district court and not appealed by defendants. He is therefore free to express himself on religious matters, in both written and spoken form, subject only to restrictions reasonably related to legitimate pedagogical interests. Defendants confirm this on appeal. However, the Mullers' challenge to the entire Code fails. The Code, including the provision requiring a statement disclaiming school endorsement which the district court found unconstitutional, is a facially reasonable tool for ensuring that student-sponsored publications do not interfere with the school's critical educational mission. It is therefore constitutional.
 
 
 45
 AFFIRMED IN PART, REVERSED IN PART.
 
 
 46
 ESCHBACH, Circuit Judge, concurring.
 
 
 47
 I concur in all respects with the court's opinion except for Part II. As the court makes clear in Part III, the Code provisions are reasonable and may be upheld on that ground. It is unnecessary, therefore, for this court to speculate that the free speech rights elaborated in the Tinker line of cases do not extend to elementary school children.
 
 
 48
 ILANA DIAMOND ROVNER, Circuit Judge, concurring in part and in the judgment.
 
 
 49
 The issue before us today is whether Sections 6144.11 and 6144.12 of the Racine Unified School District Code of Student Responsibilities and Rights (the Code), which governs the display or distribution of non-school-sponsored publications on school premises, is a facially invalid restriction on the free speech rights of grammar school students. My colleagues conclude that so long as a restriction is "reasonable," it does not violate the First Amendment. To come to this conclusion, however, the majority relies on a line of cases that pose a significantly different question from the one we are confronting here.
 
 
 50
 In Hazelwood School Dist. v. Kuhlmeier, the Supreme Court considered "the extent to which educators may exercise editorial control over the contents of a high school newspaper produced as part of the school's journalism curriculum," 484 U.S. at 262, 108 S.Ct. at 565, and began its analysis by reaffirming the basic principle governing students' First Amendment rights in the public school setting that it had proclaimed in Tinker:
 
 
 51
 Students in the public schools do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.' They cannot be punished merely for expressing their personal views on school premises ... unless school authorities have reason to believe that such expression will 'substantially interfere with the work of the school or impinge upon the rights of other students.'
 
 
 52
 Hazelwood, 484 U.S. at 266, 108 S.Ct. at 567 (quoting Tinker, 393 U.S. at 506, 509, 89 S.Ct. at 736, 737) (internal citations omitted). The Court then carefully distinguished the issue whether a school is required to tolerate student speech that occurs on school premises (which the Court had resolved in Tinker), from the issue in Hazelwood concerning the degree of control educators may retain over "student speech that is disseminated under [the school's] auspices." Id. at 271-72, 108 S.Ct. at 570.
 
 
 53
 It was in this context, then, that the Court held that educators may exercise control over the content of student speech "in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273, 108 S.Ct. at 571. Thus, the cases the majority relies on to establish the proper standard of review in the present case were directed at determining the extent of the authority educators may, consistent with First Amendment principles, assert over officially-recognized school activities in which their students participate, whether those activities be an integral part of the school curriculum as in Hazelwood, id. at 262, 108 S.Ct. at 565, or involve voluntary participation in a school-sponsored assembly as in Fraser, 478 U.S. at 677-78, 681, 106 S.Ct. at 3161-62, 3163; see also Board of Educ. of Westside Comm. Schools v. Mergens, 496 U.S. 226, 240-41, 110 S.Ct. 2356, 2366-67, 110 L.Ed.2d 191 (1990) (opinion of the Court). Yet the Code we are examining governs only the display or distribution of printed materials that originate with the students themselves, outside the purview of any school-sponsored activity. I thus remain unconvinced that a reasonableness standard is applicable to this case, and believe that a more searching review, akin to that applied in Tinker, is appropriate, particularly because the Code at issue here involves a prior restraint on student speech. See Burch v. Barker, 861 F.2d 1149, 1157-59 (9th Cir.1988).
 
 
 54
 In Tinker, the Supreme Court held that, in order to justify prohibition of student speech or expression, school officials must show that the speech would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." 393 U.S. at 509, 89 S.Ct. at 738 (internal quotations omitted). Thus, any regulation that requires the prescreening of non-school-sponsored materials must, at a minimum, be focused on avoiding substantial disruption or interference with school discipline. See Burch, 861 F.2d at 1155. Needless to say, I disagree with the suggestion that the standard articulated in Tinker is unlikely to apply to grammar school students.[1] (See ante, Part II.) Given the difference in age and maturity between grammar school and high school students, I can certainly envision that speech that would be relatively innocuous in a high school setting may nonetheless "substantially interfere with the work of the school or ... the rights of other students" (Tinker, 393 U.S. at 509, 89 S.Ct. at 738) in the context of a grammar school. Yet this observation hardly requires us to disavow Tinker, but only to apply it to the present case "in light of the special characteristics of the school environment" (id. at 506, 89 S.Ct. at 736) with which we are concerned.
 
 
 55
 Despite the disagreements I have outlined above, I nevertheless join the majority in holding that the Code does not deprive grammar school children of their First Amendment rights. I do so because I am convinced that the Code would survive closer review than the majority applies. In my view, grammar school children are highly impressionable, and school is a powerful setting where speech is likely to make a stronger psychological impact on young minds than it would in most other settings. Because it is often difficult for children to distinguish the source of a message conveyed to them in school, or to decide what weight to give to that message, I concur that a regulation requiring the prescreening of printed materials distributed to children in grammar school is consistent with the First Amendment. Indeed, I agree with the majority that in grammar school, "there is no practical way to protect students from materials that can disrupt the educational environment or even severely traumatize a child without some form of prior restraint," and that a "post-hoc response" certainly cannot be relied on to undo the damage caused by a distribution of literature that contains libelous or obscene language, promotes intolerance or hatred of groups or individuals, or otherwise greatly compromises school discipline or interferes with the rights of the other students. (Ante at 1541.) The majority's own analysis therefore shows that educators in a grammar school have a substantial interest in protecting students from printed materials that could seriously harm young children, and that the prescreening provision of the Code is necessary to furthering that interest. This, in turn, implies that the Code is not merely a "reasonable" restriction on speech, but one that would survive a significantly more stringent review.
 
 
 56
 I also disagree with the majority that a time limit on the prescreening of printed materials is merely an administrative matter without constitutional implications. (See ante at 1541-42.) To the contrary, I believe that a reasonable time limit on the prior review of such materials remains an important factor in determining whether a prior restraint is constitutional, and that a regulation containing no limitation whatsoever on the review period would not pass constitutional muster. See Nitzberg v. Parks, 525 F.2d 378, 383-85 (4th Cir.1975) (per Justice Clark, sitting by designation); Quarterman v. Byrd, 453 F.2d 54, 59-60 (4th Cir.1971); Eisner v. Stamford Bd. of Educ., 440 F.2d 803, 810 (2d Cir.1971); see also FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 225-30, 110 S.Ct. 596, 604-07, 107 L.Ed.2d 603 (1990) (O'Connor, J., plurality opinion). This Code, however, provides that non-school-sponsored publications are to be given to the principal at least 24 hours before their proposed distribution. I would interpret this to mean that in the usual case, approval or disapproval for distribution would take place within 24 hours or shortly thereafter. Of course, I agree that unforeseen circumstances having nothing to do with a desire on the part of any school administrator to squelch protected speech may arise, making it impractical for the administrator to adhere to this time limit. I also agree that a school administrator would not violate the First Amendment merely because she might on occasion fail to provide an answer within 24 hours of receiving a proposed handout from a student. I simply point out that the Code as written obviously contemplates a rapid response to a student's request to distribute printed materials, and as such, the Code is a facially valid restriction on the speech of grammar school students.
 
 
 57
 For these reasons, I join in the court's judgment, and also in Parts III. D., E. and F. of its opinion.
 
 
 
 [1]
 The reference is to 2 Timothy 2:15: "Study to shew thyself approved unto God, a workman that needeth not to be ashamed, rightly dividing the word of truth."
 
 
 [2]
 Section 6144.11 states in part:
 Non-School-Sponsored Publications
 Publications produced by school district students without school sponsorship, or handbills, may be distributed and/or sold within the school according to the following procedure.
 
 
 [1]
 They must include the name of the sponsoring organization and/or individual
 
 
 [2]
 A time and place for the distribution must be set cooperatively with the principal
 
 
 [3]
 A copy must be given to the principal at least 24 hours before its distribution
 
 
 [4]
 The publication shall contain this phrase: "The opinions expressed are not necessarily those of the school district or its personnel."
 
 
 [5]
 If the principal finds the publication (1) contains libelous [as defined in the "Definition of Terms"] or obscene language, (2) may incite (lead) persons to illegal acts, (3) is insulting to any group or individuals, or (4) he/she can reasonably forecast that its distribution to the students will greatly disrupt or materially interfere with school procedures and intrude into school affairs or the lives of others, the principal shall notify the sponsors of the publication that its distribution may not be started, or must stop. The principal shall state the reason for his/her decisions
 
 
 [3]
 Section 6144.12 states:
 Distribution and Displaying Materials
 The written permission of the school principal or the Superintendent of Schools is required before students may distribute or display on designated bulletin boards, materials from sources outside the school.
 
 
 [4]
 See Cornelius, 473 U.S. at 806 & 808, 105 S.Ct. at 3451 & 3452 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint-neutral...."; "The Government's decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation."); Perry, 460 U.S. at 46, 103 S.Ct. at 955 (regulation in nonpublic forum permissible "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.") (emphasis added)
 
 
 [5]
 Some might consider Hazelwood a narrowing of the free speech rights Tinker had granted public high school students. See id. at 290, 108 S.Ct. at 580 (Brennan, J., dissenting) (accusing the Court of "denud[ing] high school students of much of the First Amendment protection that Tinker itself prescribed."); see, e.g., Bruce C. Hafen, Comment: Hazelwood School District and the Role of First Amendment Institutions, 1988 Duke L.J. 685, 692-99 (explicating shift away from more exacting Tinker review to deferential rational basis review for student expression implicating school's educational mission); Salomone, supra, at 266-67 (noting that in Hazelwood Court "took a giant step on its developmental path toward a view of schooling that is firmly grounded in community power and values inculcation" instead of student rights). We need not draw that conclusion; rather we can take Hazelwood's non-public forum analysis at its face value
 
 
 [6]
 The Mullers cite one district court case extending such rights to elementary school students. See Johnston-Loehner v. O'Brien, 859 F.Supp. 575 (M.D.Fla.1994); see also Jeglin ex rel. Jeglin v. San Jacinto Unified School District, 827 F.Supp. 1459 (C.D.Cal.1993) (dress code violates free speech rights of elementary school students)
 
 
 [7]
 John Stuart Mill, the principal proponent of the "marketplace of ideas" metaphor, thought it inapplicable to children: "It is, perhaps, hardly necessary to say that [the marketplace of ideas] doctrine is meant to apply only to human beings in the maturity of their faculties. We are not speaking of children...." See Hafen, supra, at n. 85 (quoting J. Mill, On Liberty 13 (C. Shields ed.1956))
 
 
 [8]
 "Any student of history who has been reprimanded for talking about the World Series during a class discussion of the First Amendment knows that it is incorrect to state that a 'time, place, or manner restriction may not be based on either the content or subject matter of speech.' " Consolidated Edison Co. v. Public Service Comm'n of N.Y., 447 U.S. 530, 544-45, 100 S.Ct. 2326, 2337-38, 65 L.Ed.2d 319 (1980) (Stevens, J., concurring in judgment)
 
 
 [9]
 John H. Ely, Democracy and Distrust 181-83 (1980) (pointless to tailor constitutional law to absurd circumstances); cf. Burns v. United States, 501 U.S. 129, 137, 111 S.Ct. 2182, 2186, 115 L.Ed.2d 123 (1991) ("when 'confronted ... with a statute which, if interpreted literally, produces an absurd, and perhaps unconstitutional result[,] [o]ur task is to give some alternative meaning [to the statute] ... that avoids that consequence' ") (quoting Green v. Bock Laundry Machine Co., 490 U.S. 504, 527, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring in judgment))
 
 
 [1]
 Indeed, one of the plaintiffs in Tinker was a 13-year-old junior high school student. 393 U.S. at 504, 89 S.Ct. at 735