In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-3378

SHARRON BALTHAZAR,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO, JOHN MURPHY, and NICK BECKMAN,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 4760 — **John W. Darrah**, *Judge*.

ARGUED OCTOBER 8, 2013 — DECIDED NOVEMBER 8, 2013

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges*.

POSNER, *Circuit Judge*. Sharron Balthazar sued the City of Chicago (which we can ignore) and two of its police officers under 42 U.S.C. § 1983, charging that the two officers, and several others not charged, had conducted an unreasonable search of her apartment, in violation therefore of the Fourth Amendment, which has been made applicable to searches by state or local officers (as in this case) by interpretation of the

due process clause of the Fourteenth Amendment. A jury returned a verdict for the defendants, and Balthazar appeals.

She lived on the third floor of an apartment house. There were two apartments on that floor, one facing the street and the other an alley behind the building. Police had a warrant to search the apartment facing the alley for narcotics. Both apartments had rear doors about fifteen feet apart opening on a common balcony from which flights of stairs descended to the ground. Early in a fall afternoon in 2009, police, including the two defendant officers, arrived to execute the search warrant. The officers climbed the stairs to the balcony. One of them (defendant Beckman) carried a battering ram—in police lingo he was the "breach officer" on the warrant team. Beckman swung the ram at the door of the plaintiff's apartment, breaking it open. According to the plaintiff's testimony (and also that of her 14-year-old son and her sister—the son was in the apartment with his mother and her cousin; the sister came over later, allegedly to help clean up a mess created by the police), the officers entered the Balthazar apartment, screaming profanities and pointing their guns, which included "long guns" (not further defined), "face-to-face, like two inches away," at the occupants (the plaintiff, her son, and a cousin, who didn't testify, of the plaintiff's). The officers handcuffed the plaintiff and her cousin and ransacked the apartment, dumping "flour and sugar everywhere and food on the floor," opening drawers, flipping mattresses, throwing clothing, and in short turning the apartment into a "total disaster." Ten or fifteen minutes into the search another officer appeared and told the searchers they were in the wrong apartment, whereupon they all left for the other apartment on the plaintiff's floor, the one for which they had the search warrant.

That is the plaintiff's version of the facts. According to the defendants, Beckman, wanting to "get up the stairs as quickly as possible" to avoid a "potential hazard," became slightly disoriented lugging the battering ram—which weighed at least 30 pounds and possibly as much as 85 pounds—up two and a half flights of stairs (the first floor of the apartment house was a half flight of stairs above the ground). As a result he confused the two apartments on the plaintiff's floor. He was the first officer to reach the balcony but officer Murphy, the other defendant officer and the leader of the warrant team, was only about ten feet behind Beckman on the staircase and saw that Beckman was at the wrong door and shouted "wrong door, wrong door!" Too late; Beckman had started to swing the battering ram and couldn't check its momentum, though in an unsuccessful effort to avoid hitting the door he was able to lower the ram far enough that it hit just the bottom of the door. Still, the door burst open and he saw a man inside (it must have been the cousin), as did Murphy and another officer, who was close behind him. None of the officers entered the plaintiff's apartment. They rushed immediately to the other apartment, the one designated in their warrant, and searched it after battering in the door when no one answered their demand to open the door (there turned out to be no one in that apartment).

The plaintiff's brief recites Balthazar's version of the facts as if it were Gospel, but changes gears in the argument section and says that "the undisputed facts at trial established that Defendant Beckman forcibly breached Plaintiff's back door and was able to observe inside Plaintiff's apartment without a warrant or any other legal justification. Courts have repeatedly held that viewing inside Plaintiff's apart-

ment under these circumstances constituted a search." The argument sections of her briefs contain no reference to the version of the facts to which the plaintiff testified and which the lawyer in his opening and closing arguments urged the jury to accept: no reference to guns, handcuffs, flour and sugar on the floor, mattresses upended, etc.

We'll discuss the objections of the plaintiff's lawyer to rulings by the judge concerning the alternative factual narrative, in which the "search" is a glance sans handcuffs and guns and ransacking. But even if the objections are compelling, it would be a travesty of justice for the plaintiff to be allowed to prevail. If the police officers did not enter her apartment, terrify the occupants by pointing "long guns" at them, handcuff her and her cousin, and ransack the apartment, then her testimony that they did these things was perjured (doubtless to magnify her damages if she prevailed, as the police had already voluntarily paid for the damage to the door), because she couldn't have been innocently mistaken in testifying to these actions. In effect her counsel is telling us: "Yes, she lied, and that's why I'm going to talk just about the alternative theory, which is that Beckman, having after mistakenly breaking in glanced into the apartment (how could he help doing so?) and the glance was a search." The glance-in theory is true only if the handcuff-long-gun-ransack theory is false, and if it's false that is because it's a fabrication by the plaintiff, aided and abetted by her son and sister. It couldn't be an erroneous recollection. What reasonable jury would accept a theory of liability that presupposed that the plaintiff was a perjurer?

There is every indication that it was indeed a fabrication. The only witnesses called by the plaintiff, besides herself,

her son, and her sister, were the two defendants and one
other officer—adverse witnesses all three of whom denied
the plaintiff's tale. And the sister did not confirm the pres-
ence of flour and sugar on the kitchen floor, or the son his
mother's testimony that he was so frightened by the incident
that he wanted to sleep in her bed "all the time." He testified
that he played basketball later that day, laughed about the
event with his mom, and that within two days the incident
was completely gone from his thoughts, except that he "can't
believe in the police that much no more"(a remark consistent
with the police having simply broken open the door by mis-
take). While insisting that the officers brandished "long
guns," mother and son were evasive and would not testify
that by "long guns" they meant rifles or shotguns rather
than pistols.

Balthazar did take her son to a hospital several days after
the incident, presumably for psychiatric counseling, and was
billed $623 for the visit (plus the same amount for whatever
counseling or other services she received from the hospital).
But no medical record of diagnosis or treatment either of her
or her son was placed in evidence. The son was given a pre-
scription at the hospital, but he doesn't know for what, and
he didn't fill it.

Neither the City claims adjuster who visited the apart-
ment the day of the incident, nor the employee of the Inde-
pendent Police Review Authority who took the plaintiff's
call reporting the incident, testified that the plaintiff had
complained about anything other than damage to her door.

In his closing argument the defendants' lawyer told the
jury: "Even plaintiffs' counsel doesn't believe his clients"
(clients, not client, because Balthazar's son was originally a

plaintiff, though he dropped out of the case at some point, for undisclosed reasons). The plaintiff's counsel objected to the comment about not believing his clients, but the judge overruled the objection on the ground: "This is argument." By "argument" the judge must have meant that the defendants' lawyer was drawing an inference from evidence presented at the trial. It was not an unreasonable inference, but it was speculation; at most the lawyer could have inferred, from the emphasis that the plaintiff's lawyer placed on the second theory of liability (what we're calling the "glance-in" search), that the lawyer didn't expect the jury to believe the first theory. That may have been what the defendants' lawyer meant by the remark, but it was not what she said. What she said sounded as if she might have some private knowledge that the plaintiff's lawyer disbelieved his client. The defendants acknowledge in their brief that the statement that the plaintiff's counsel did not believe his client was "improper."

In closing argument, discussing the theory of the glance-in search, the defendants' lawyer said: "Now, what about seeing inside an apartment as an unreasonable search? What does seeing inside mean? If taken literally, it means that every time a police officer walks by a window or an open door, that he's conducting a—" whereupon the plaintiff's lawyer objected. The judge overruled the objection. The defendants' lawyer went on to say that "with these facts, seeing a person standing inside an apartment and nothing more, and considering that a search, is not common sense." Again an objection, again overruled.

Evidently the jury was confused about what constitutes a search, because during its deliberations it sent a note to the

judge saying: "Can you please place points of clarification upon the following statement: 'A search does not require physical entry into a home or apartment. Simply breaching an entry door and seeing inside an apartment constitutes a search.' Please provide insight as to if this statement is fact in a court of law or just a general statement. Further, can you define the word 'seeing'?" The judge responded: "The law that you are to apply is contained in the jury instructions. Please consider all of them carefully."

In fact the instructions had addressed briefly and clearly the very question that the jury asked: "A search does not require physical entry into a home or apartment. Simply breaching an entry door and seeing inside an apartment constitutes a search." The instruction had been proposed by the plaintiff's lawyer and unsuccessfully opposed by the defendants' lawyer; we'll see shortly that it was excessively favorable to the plaintiff. The jury's question quoted the passage back to the judge. Had the judge repeated the instruction in response to the jury's question, adding that the instruction was not merely a "general statement" but an exact and correct statement of the law and therefore binding on the jury, and that the word "seeing" in the instruction was meant in the everyday sense of the word, the jury's confusion would almost certainly (so far as one can be certain in such matters without interrogating the jurors, which is forbidden) have been dispelled. Merely to tell the jurors that "the law that you are asked to apply is contained in the jury instructions" failed to direct them to the one instruction that would dispel any confusion.

Over and over again in their brief the defendants recite the mantra that juries are presumed to obey the judge's in-

structions. It is true that a verdict consistent with correct in-structions can't be assumed to have been based on a misun-derstanding by the jury. But a false statement by counsel to the jury, left uncorrected by the judge, or a cryptic answer to a question submitted to the judge by the jury, can under-mine the reliability of the verdict even if there is no actual error in the instructions. Clarity is as important as accuracy given the limitations of jurors' comprehension. See, e.g., *Skidmore v. Baltimore & Ohio R.R.*, 167 F.2d 54, 64–65 (2d Cir. 1948); Dennis J. Devine, *Jury Decision Making: The State of the Science* (2012); Bethany K. Dumas, "Jury Trials: Lay Jurors, Pattern Jury Instructions, and Comprehension Issues," 67 *Tenn. L. Rev.* 701 (2000). But the bobbles we've mentioned were harmless, given the collapse of the plaintiff's primary theory. That left, as the only alternative characterization of the incident of the broken door, an innocent mistake by the police. And a search resulting from an innocent mistake is not unreasonable and so does not violate the Fourth Amendment. *Maryland v. Garrison*, 480 U.S. 79, 88–89 (1987).

We even doubt that what happened in this case should be considered a "search." Police forced open the door of a residence by mistake, realized their mistake immediately (in fact *before* the door opened—for remember that Beckman tried to check the forward motion of the battering ram), and left immediately. With the door open in front of him he couldn't have avoided seeing into the apartment without closing his eyes (which would have been dangerous). But having learned before looking that it was the wrong apart-ment, he wasn't using his eyes to *search* for anything. Seeing *can* be searching, but isn't always. Even before the door fell open, Beckman knew there was nothing to search for in the plaintiff's apartment.

This is not to suggest that entry is required for a search; otherwise a wiretap wouldn't be a search. Entry is neither a necessary nor a sufficient condition of searching. But an accidental entry, or an accidental breaking of a door, which exposes the interior, followed by a glance unrelated to any interest in contraband or other evidence of crime, followed by an immediate withdrawal, is not a search.

The error in equating seeing with searching is especially patent with respect to the other defendant, officer Murphy. It was he who climbing the stairs behind Beckman shouted "wrong door." When he reached the top of the stairs the door to Balthazar's apartment was open. Murphy saw the interior of the apartment through the open door. He knew it was the wrong apartment; it wasn't his fault that the door was open and that when you face an open door you see into the interior. If you know you're in the wrong place—a place you're not authorized to search or want to search—the unavoidable glance through the open door is not a search.

AFFIRMED.