In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 13-3603, 13-3700

JENNIFER PETKUS,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

RICHLAND COUNTY, WISCONSIN, *et al.,*

*Defendants-Appellants, Cross-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 12-C-104 — **William M. Conley**, *Chief Judge.*

ARGUED MAY 27, 2014 — DECIDED AUGUST 19, 2014

Before POSNER, EASTERBROOK, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* Richland County is a rural county in southwestern Wisconsin. Jennifer Petkus, the plaintiff, owns a property in the county that she calls the Thyme & Sage Ranch and that, as Richland County's official dogcatcher, she operated as an animal sanctuary until 2009, when she was arrested after an investigation by an animal- cruelty investigator for the ASPCA. The investigation resulted in a

search of her property, the termination of her employment as county dogcatcher, and her arrest, followed by prosecution for animal neglect, conviction, and a sentence to three years of probation. *State v. Petkus*, No. 2009-CM-82 (Circuit Court of Richland County, April 28, 2011). The search is the focus of the present litigation, a civil suit by Petkus against the County and several of its deputy sheriffs.

As authorized by Wis. Stat. § 173.10, the ASPCA investigator procured a warrant to search Petkus's property. The warrant directed law enforcement officers to enlist in the search veterinarians or any "other persons or agencies authorized by the Richland County District Attorney." The Supreme Court had held in *Wilson v. Layne*, 526 U.S. 603, 611 (1999), that "police actions in execution of a warrant [must] be related to the objectives of the authorized intrusion" and therefore that the police in that case should not have brought reporters into the house they were searching because their "presence … in the home was not in aid of the execution of the warrant." *Id.* at 614. In contrast, the veterinary and animal-rights people who accompanied the two or three deputy sheriffs assigned to the search of Petkus's property were more than merely helpful in executing the warrant—they *were* its executors; they conducted the search. They were some 40 to 50 volunteers from animal-rights organizations such as the ASPCA. They had not been deputized.

Richland County's brief states that the deputy sheriffs' role was not to participate in the search but simply to "keep the peace."

Almost all the animals found on the property—mainly dogs (more than 300) but also a few rabbits, horses, two llamas, a burro, a ram, and even chinchillas and cockatiels (the

last two were pets of Petkus and apparently in good health)—were removed by the search party.

This was not the first time that animals had been found in poor health on Petkus's property; in March 2009, tragically, six of ten cats who had been removed from the property on the advice of a veterinarian were found to be so far gone that they had to be euthanized.

Her suit is based on both Wisconsin and federal law. The Wisconsin claim is a common law negligence claim; the federal claim is based on 42 U.S.C. § 1983. The County's liability insurer was named as an additional defendant, along with other insurers, but as no relief is sought against any of the insurers we'll ignore them.

The asserted basis of the County's liability, as distinct from the liability of the deputy sheriffs, is the doctrine of respondeat superior. See *Lewis v. Physicians Ins. Co. of Wisconsin*, 627 N.W.2d 484, 488 (Wis. 2001); *Pamperin v. Trinity Memorial Hospital*, 423 N.W.2d 848, 852 (Wis. 1988); *Scottsdale Ins. Co. v. Subscription Plus, Inc.*, 299 F.3d 618, 621–22 (7th Cir. 2002). The animal-rights activists who conducted the search of Petkus's property were ad hoc employees of the County; the deputy sheriffs were conventional employees. It's true that a municipality can't be held liable for violations of the Fourth Amendment on the basis of the doctrine of respondeat superior, *Monell v. Department of Social Services*, 436 U.S. 658, 690–91 (1978), but the County has not challenged the applicability of the doctrine to it.

Petkus alleges that the searchers negligently caused extensive physical damage to her house, barn, fencing, gates, and other property, and emotional distress to herself, and

that the sheriff's deputies were negligent in failing to train or supervise the amateur searchers. She further alleges that by reason of this negligence and the resulting damage, the search, undertaken as it was by order of County officers acting within the scope of their employment, was unreasonable within the meaning of the Fourth Amendment, which has been held to have been made applicable to state and local government by the due process clause of the Fourteenth Amendment.

The County removed the case to federal district court, where it was tried to a jury, which found in favor of Petkus, though the judge reduced the damages awarded to her. Both sides have appealed.

What made the search unreasonable, as the jury was eminently entitled to find that it had been, was not absence of probable cause or some other defect in the warrant. It was how the search pursuant to the warrant was conducted—namely, incompetently. This was the result of the County's failure to train the Good Samaritan animal-rights people who conducted the search—inflicting in the course of doing so needless damage on Petkus's property—as temporary County agents. The County does not argue that the plight of the animals on the property was so desperate that there was no time to provide even minimal instruction to the volunteer searchers, or to assign additional deputy sheriffs, perhaps borrowed from neighboring counties, to conduct the search themselves, though they probably would have needed the assistance of veterinarians.

The incompetence of the amateur searchers is apparent from the reports of the deputy sheriffs who accompanied

them in order to "keep the peace." Here is an excerpt from a report about events on the first day of the two-day search:

> I did question the white burro being seized. I was not able to see any type of injuries on that animal and I asked the veterinarian why she was seizing that and she indicated that he was weaving and I guess I didn't understand that so I asked what the weaving meant. … [S]he [the veterinarian] believed he [the burro] was having some type of a psychological dilemma and needed to be evaluated and that was why she was taking the white burro. I guess I really didn't understand that I had not seen any actions on his [the burro's] behalf of that nature, but she is the trained medical veterinarian and I'm not.
>
> … In this pasture were sheep, lamas [*sic*], mini ponies, and one Holstein steer. They did finally get a group of the mini ponies cornered in one corner of the pasture and they [the veterinarian and animal rights volunteers] had a piece of orange plastic fencing stretched out trying to keep them confined in that one area. … Jeffrey who is the lama [*sic*] had walked up behind the people that were holding the orange fencing and one of the gentleman [*sic*] reached out and just took his hand and kind of shoved Jeffrey away and Jeffrey became somewhat upset and knocked the orange fencing down. The mini ponies stampeded running out over the fencing and they knocked the Dane County Vet Tech down and she fell into another female working from the Humane Society of the United States who fell down and from all appearances it looked like she had broken her wrist. [She had.]

As a second report indicates, the searchers left the property in shambles:

> When we [Petkus and the deputy sheriff] went back into the residence [of Petkus] on the 21st [the day after the

two-day search ended] things were not in the same condition. I did take several pictures of the residence on the second day that I was there. There was dog feces on the floor, things had been opened and there was trash thrown into the day beds where the puppies were. … There were scratches on a bistro type table top that were not there the day before when we were there. There was spilled dog food in the kitchen sink, there were marks and scratches on the doors and walls that looked like somebody had tried to carry something through and marred the doors. There was just garbage all over the place. … In the barn I did notice that there were pop cans thrown on the ground. … [I]t just generally looked like the garbage was dumped anywhere and everywhere. Things were in disarray, some things were damaged. There was a cage that had housed I believe it was gerbils and the glass or plexi glass front of that had been broken apart and I guess instead of opening the doors they just broke the plastic to get them out. There was dog food spilled on the floors, dog feces that was just ground into the floor. It was just generally quite a mess compared to what it had been two days prior to that when I was at the residence.

The jury awarded Petkus damages of $193,480, of which $133,480 was for the negligent conduct of the search and the other $60,000 for the violation of the Fourth Amendment. The district judge entered judgment for only $133,480 ($193,480 – $60,000), however, explaining that although there had been two violations there had been only one injury and the higher of the jury's two valuations of the injury was $133,480. The County's appeal seeks annulment or reduction of the entire judgment, Petkus's appeal restoration of the damages that the judge disallowed.

The evidence that the property damage inflicted by the search was a result of negligence by the searchers, and by the sheriff's deputies who launched them on the search, was sufficient to justify the verdict on that count of the complaint. Although $133,480 seems an excessive estimate of the damages, there was enough evidence supporting it to preclude a reduction by the district judge or by us.

The County argues that the damage to property was no more than $40,000, so that the rest of the jury's award must have been for emotional distress—and under Wisconsin law emotional distress resulting from negligent destruction of property (even if the property is a beloved pet animal) is not compensable. E.g., *Rabideau v. City of Racine*, 627 N.W.2d 795, 802 (Wis. 2001). But the County forfeited the point by failing to raise it at the trial.

The judge was right to disallow the $60,000 component of the verdict. Petkus had established two separate violations, but the damage caused by the searchers' negligence was the same damage caused by the search's having violated the Fourth Amendment. The searchers may have inflicted some damage through carelessness and other damage deliberately, but there is no basis in the evidence for distinguishing between the two types of behavior. We mustn't forget that the suit is against the County and its officers rather than against the amateur searchers. The relevant negligence is that of the officers and it's irrelevant whether it consisted of failing to prevent deliberate or merely careless searching by the untrained, unsupervised animal-rights activists who conducted the search. Turning them loose on Petkus's property violated her Fourth Amendment rights by initiating an unreasonable search.

Not that the jury instructions were clear in distinguishing between the common law tort claim and the Fourth Amendment claim. The judge instructed the jury that "if a certain type of award applies to both claims [negligence and Fourth Amendment], include the amount in the space provided for each claim. The court and parties will take care of any overlap awarded." How they would "take care" of the "overlap" was never discussed—but neither was it objected to. What the judge did of course was simply lop off the portion of the damages award that the jury had allocated to the Fourth Amendment violation.

So Petkus's appeal fails. But what of the County's appeal?

We have no basis for disturbing either the jury's finding of negligence or its finding that the search was unreasonable. The search warrant was valid, but the conduct of the search unreasonable, making the search unreasonable within the meaning of the Fourth Amendment. See *United States v. Ramirez*, 523 U.S. 65, 71 (1998); *Tarpley v. Greene*, 684 F.2d 1, 8–9 (D.C. Cir. 1982). Police can't be permitted, merely by virtue of having obtained a search warrant, to allow an untrained, unsupervised mob (however well-intentioned, as we may assume the animal-rights activists who conducted the search to have been) to conduct a search likely to result in gratuitous destruction of private property because of the mob's lack of training and supervision. What the police could not have done lawfully had they conducted the search themselves they could not authorize private persons to do in their stead. *Blum v. Yaretsky*, 457 U.S. 991, 1003–05 (1982); *United States v. Shahid*, 117 F.3d 322, 325, 327–28 (7th Cir. 1997); *United States v. Feffer*, 831 F.2d 734, 737 (7th Cir. 1987);

*United States v. Momoh*, 427 F.3d 137, 140–41 (1st Cir. 2005); *United States v. Parker*, 32 F.3d 395, 398–99 (8th Cir. 1994). Police cannot hire the Hell's Angels to conduct highway patrol and, though failing to train or supervise them, shuck off responsibility when one of the Angels beats a speeder into a bloody pulp with a tire iron.

The County argues that it can't be responsible for the damage to Petkus's property because the sheriff's deputies did not supervise the animal-rights activists who conducted the search and who therefore inflicted the damage. The argument—which amounts to saying the greater the County's negligence the less its culpability—is frivolous. If accepted, it would shred respondeat superior, the applicability of which in this case the County has failed to challenge. Employers would be off the hook just by letting their employees run wild.

The County also argues that even if it violated federal and state law, it is absolutely immune from liability by virtue of Wis. Stat. § 893.80(4). That statute provides that "no suit may be brought against any … governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees … for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." As the Supreme Court held in *Felder v. Casey*, 487 U.S. 131, 138 (1988), the statute can't immunize the County from liability for violating federal law. But neither can it immunize the County against Petkus's state-law claims. For although the County invoked the statute in its answer to the complaint, that was the last mention of it, so the defense has been forfeited. The County argues that the immunity *can't* be forfeited; Wisconsin's supreme court has

held that it can be. *Anderson v. City of Milwaukee*, 559 N.W.2d 563, 570 (Wis. 1997).

Wisconsin does, however, cap damages for unlawful acts, other than intentional torts, committed by government agencies or their employees. Wis. Stat. § 893.80(3). The cap ($50,000) is applicable to Petkus's negligence claim, which is based on state law; and although the County failed to mention it at trial or ask that it be included in the instructions to the jury, the cap cannot be waived by omission to plead it—even after judgment. *Anderson v. City of Milwaukee*, *supra*, 559 N.W.2d at 569. It's an open question whether the defendants could be deemed to have waived a state law damages cap by failing to assert it properly in *federal* court, but it is a moot question in this case, as we're about to see.

The jury determined that the damages caused by the County's negligence was $133,840; the implication may seem to be that the judge should have cut the award to $50,000. But that is not correct. The $133,840 worth of damage was the indivisible consequence of the violation of the Fourth Amendment and the violation of state law. Had there been no violation of state law but only of the Fourth Amendment, the damage to Petkus would have been the same, and likewise had there been a violation only of state law.

The County makes some other arguments, only one of which we need mention: its objection to the jury instructions. Although it submitted its own instructions, which the judge declined to give, it failed to object to the instructions that the judge did give. That was another forfeiture. Fed. R. Civ. P. 51(c)(2); *Chestnut v. Hall*, 284 F.3d 816, 819–20 (7th Cir. 2002); *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1037 (9th

Cir. 2003); *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56–57 (2d Cir. 2002).

The judgment is

AFFIRMED.