In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1867

ESTATE OF ADAM BROWN,

*Plaintiff-Appellant*,

*v.*

TIMOTHY THOMAS, MATTHEW SECOR, and BROWN COUNTY,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:12-cv-01202-WCG — **William C. Griesbach**, *Chief Judge*.

ARGUED OCTOBER 3, 2014 — DECIDED NOVEMBER 13, 2014

Before POSNER, ROVNER, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. Adam Brown, age 22, was at home with two friends in his ground-floor apartment in Green Bay, Wisconsin at 6:20 p.m. on a December evening, when there was a sudden knocking on his door and a yell of "police, search warrant!" As the police began to force open the front door when no occupant opened it, Brown ran upstairs to his bedroom and grabbed an unloaded shotgun that he kept there. Police followed. As they reached the top of the

stairs they saw him standing in a corner of the bedroom pointing the shotgun at them. One of the officers, defendant Secor, shot Brown dead with an automatic rifle, precipitating this suit under 42 U.S.C. § 1983 against Secor, another officer in the search party (Thomas, who has, however, since been dismissed from the case), and their employer, Brown County. The district court granted summary judgment in favor of the defendants, precipitating this appeal by Brown's estate.

Secor had no way of knowing that the shotgun was unloaded. Had it been loaded with buckshot a single shot at so close a range would have been fatal. The estate contends not that Secor shouldn't have pulled the trigger when he saw a shotgun was pointed at him but that the police search was executed in an unreasonable manner (see, e.g., *Terebesi v. Torreso*, 764 F.3d 217, 233–36 and n. 16 (2d Cir. 2014); cf. *Petkus v. Richland County*, 767 F.3d 647, 650–52 (7th Cir. 2014)), violating the Fourth Amendment and causing Secor mistakenly to think he had to kill Brown in self-defense.

According to the estate's version of events, when Brown peered out of his front window in response to the knocking and the shout he found himself face to face with a man—it was Officer Secor—holding an automatic rifle, dressed in dark civilian clothes, with long hair, earrings, a goatee, and sideburns, and wearing a hoodie and a baseball cap. Brown turned away from the window, yelled "What the fuck … we are getting robbed again" (recently the apartment had been robbed by a person pretending to be an acquaintance), and fled upstairs. One of Brown's friends yelled to him "Get the shotty!" as Brown streaked to the back of the apartment and up the stairs to his bedroom (the apartment was a duplex). Within seconds the police broke down the front door and

entered—five in all, two others having gone around to the back of the house to stop anyone from leaving by the rear door.

The officers had a valid search warrant; there was probable cause to believe that a burglar had hidden stolen property in Brown's apartment. The County's practice is for almost all searches to be executed by a drug task force trained in SWAT tactics and therefore heavily armed. In order to be sure that the search will indeed be of the building specified in the warrant, the team dispatches undercover officers to find the building and lead the team into it. Secor was one of the undercover officers, which was why he was accoutered as he was. The only indication that he was a police officer rather than a criminal was a badge he was wearing around his neck, and it's unclear whether Brown could have seen the badge in the dark when he looked through his window to see who was outside shouting. The officer standing behind Secor was wearing a jacket that said "police," as well as a badge, but was otherwise dressed in civilian clothes like Secor. The other three officers in the group that entered the apartment were wearing standard police uniforms but had been in the background, in darkness, when Brown peered outside.

The estate's case begins with the contention that the police had no need to conduct the search after dark (it is dark at 6:20 p.m. in December in Green Bay—sunset was at 4:14 p.m. the day of the search). There was no urgency. It was not like the search of a stash house, which might contain large quantities of drugs and money. The police were looking for some loot of modest value (a video game system, a couple of video games, and a few other small items) plus the burglar

who had stolen it, whom the police correctly believed to be in Brown's apartment. Brown himself was not the suspect. In these circumstances, the estate argues, the search didn't have to be conducted by a heavily armed SWAT team, let alone a team led by an undercover police officer who looked like an armed thug. It was especially dangerous, the argument continues, for him to be the first officer whom an occupant of the apartment would see, because home invasions by criminals pretending to be police are apparently common, though remember that the previous break-in to Brown's apartment had been by someone pretending to be an acquaintance rather than a cop.

If the search was conducted in an unreasonable manner and therefore violated the Fourth Amendment—more precisely the principles of the Fourth Amendment, deemed applicable by interpretation of the due process clause of the Fourteenth Amendment to state and local searches—and Brown would not have been killed had the search been conducted in a reasonable manner, then his estate has a valid claim against Officer Secor and maybe (as we'll see) against Brown County as well.

The police had considered whether to conduct so forceful a search, and had decided to do so mainly because they thought that the burglar who had stashed the loot in the apartment was an escapee from jail, where he was serving time for robbery, and might put up a struggle. (He didn't.) The police also had "word" that Brown and his girlfriend (who lived with him but was not in the house at the time) were always in "trouble." What type of trouble was not further specified but the fact that Brown turned out to possess illegal shotguns (he had two, only one of which he bran-

dished) suggests that their suspicion may have been justi-
fied.

The judge ruled that the search was reasonable, although
nighttime searches, especially of a residence (which unlike a
store or an office building is likely to be occupied at night),
are risky undertakings, and disfavored. Although there is a
difference between a search late at night, when the residents
are likely to be asleep, and a search in late afternoon or early
evening, there doesn't seem to have been any reason not to
postpone the search of Brown's apartment till daylight. In-
deed since it was dark and the police could not be clearly
identified until they entered, the decision to search before
daybreak seems to have been foolish. The defendants say
that the police were heavily armed because they anticipated
several occupants, one a "robber" who had escaped from jail
and two others who were regarded as "trouble." But the
robber (the burglar) was not an escapee in the traditional
sense. A participant in a work-release program at the county
jail, he had been authorized to go to work in the morning
but required to return in the evening—which he'd failed to
do at some point before the search took place.

The defendants don't argue that the police had to be
heavily armed because the occupants might be armed; they
didn't know about the shotguns in the apartment, or any
other weapons. Putting the suspicious-looking undercover
officer at the front of the police team has not been explained.
True, the undercover officer is the member of the team who
knows the address and is therefore least likely to knock on
the wrong door, cf. *Balthazar v. City of Chicago*, 735 F.3d 634
(7th Cir. 2013), but Secor could have told one of the officers
with him "that's the door," and having done so stepped back

so as not to be visible from the doorway or a window. But who knocked is not important. What is important is that when Brown, alarmed by the knocking, peered out of the window, there in plain view was ominous-looking, no-uniform Secor. No doubt the undercover officer, having superior knowledge of the suspects, maybe of the interior of the residence, and so forth, should be part of the search team; the question is whether he should be at the very front of the team, hence the person most likely to be seen by an occupant of the residence.

The appendix to the estate's brief contains a formidable expert report by William T. Gaut, holder of several degrees, including a Ph.D. in Criminal Justice, and a police officer for 24 years who attained high rank in the Birmingham, Alabama police department and has also been employed by private security firms. His report emphasizes the difference between drug searches and searches for stolen property, and the need to utilize the kind of methods used in the search of Brown's apartment when one is searching for illegal drugs—but not otherwise—because drug dealers tend to be heavily armed and drugs often can easily be disposed of. Although it was the drug task force that conducted the search of Brown's apartment, it was not looking for drugs; and Gaut argues in his report that when searching merely for stolen property (unless of course the property consists of illegal drugs), the search "should be conducted during daylight hours" and "an easily identifiable police officer shall knock and notify persons inside" in order "to reduce or eliminate the possibility of misidentification. It is well known that perpetrators of a home invasion, for the purpose of gaining entry, sometimes impersonate police officers" but rarely "have the complete visual identity including clothing with

the word 'POLICE' prominently written on both the front and back." The report also notes that there was a lot of confused shouting by the officers as they piled into Brown's apartment; apparently one officer shouted "Get down, mother fucker!" which might have made the occupants including Brown further suspect that the intruders weren't really cops.

Gaut's report concludes that the search of the apartment was a "gross deviation from accepted police practices and procedures by the Brown County Sheriff's Office," a deviation that rose "to the level of substantial, deliberate indifference for the rights and safety of" Brown.

But even if Gaut's report is 100 percent on the mark, it can't justify imposing liability on Secor. Secor did not devise the search policy adopted by Brown County. He was doing what he was told to do when, accoutered as he was, he led the search of Brown's apartment. Of course if one is told by one's superiors to do something that is obviously illegal, it is no defense that one was just obeying orders; that was a defense conclusively rejected at the Nuremberg trials of Nazi war criminals. But the situation in this case was not that extreme. There were as we mentioned reasons for having the undercover officer, who needs a goatee, sideburns, etc. in his undercover work, lead the search. There was no compelling reason for him to be the one to knock on the door, but it wasn't because of that, but because he was visible through the window, that Brown saw him and commenced his fatal flight.

Even if we thought Secor may have been exceeding proper constitutional bounds in leading the search given his appearance, he would still be entitled to qualified immunity,

thus defeating the estate's claim against him. As explained in *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014), "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.' In addition, '[w]e have repeatedly told courts … not to define clearly established law at a high level of generality,' since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced" (citations omitted).

Gaut's report is, however, evidence that the County—the other remaining defendant—may have failed, through reckless indifference to the safety of persons who find themselves in premises subjected to a police search, to teach its police how to conduct a competent search. It's true that a suit under section 1983 is not governed by the common law doctrine of respondeat superior; liability for a police officer's violation of constitutional rights while acting within the scope of his employment is not automatically imposed on his employer, in this case Brown County. *Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Gernetzke v. Kenosha Unified School District No. 1*, 274 F.3d 464, 469 (7th Cir. 2001). But if the violation stems more or less directly from acts of the employer, as it did in this case if indeed the County prescribed an unconstitutional search protocol for its police to follow, the employer is liable.

Gaut's report severely criticizing the County's search policy might, if admissible (compare *Florek v. Village of Munde-*

*lein*, 649 F.3d 594, 601–03 (7th Cir. 2011)), entitle the estate to a trial, were it not for a fatal procedural error by its lawyer: failing to authenticate Gaut's expert report. It was filed with the district court but could not be admitted into evidence without an affidavit attesting to its truthfulness. Fed. R. Civ. P. 56(e)(3); Fed. R. Evid. 901(a); *Scott v. Edinburg*, 346 F.3d 752, 759–60 and n. 7 (7th Cir. 2003). There was no affidavit. Nor did the plaintiff's lawyer cite Gaut's report in opposing the defendants' motion for summary judgment. On appeal he made the convoluted argument that it was the defendants' burden to depose Gaut and that having failed to do that they admitted that everything in his report was true. Not so. Deposing a witness is optional. Anyway the report could not be used to oppose summary judgment because it was inadmissible. Without the report there is insufficient evidence to justify imposing liability on the County.

AFFIRMED.