In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2084

Sharon Gernetzke, individually, and
Doreen Bezotte, parent and legal
guardian of Joseph Bezotte,

Plaintiffs-Appellants,

v.

Kenosha Unified School District No. 1,
Michael Johnson in his official capacity
as Superintendent of Kenosha Unified
School District No. 1, and Chester Pulaski in
his official capacity as Principal of
George N. Tremper Senior High School,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00 C 201--Charles N. Clevert, Judge.

Argued October 29, 2001--Decided December 14, 2001


  Before Flaum, Chief Judge, and Posner and
Diane P. Wood, Circuit Judges.

  Posner, Circuit Judge.  Two high-school
students sued a Wisconsin public school
district and two of its administrators,
the superintendent of the district and
the principal of the plaintiffs' school
(which is located in the City of
Kenosha), charging violations of their
constitutional and statutory rights to
religious freedom. They sought both
damages and injunctive relief. The
individual defendants were sued only in
their official capacities, so naming them
as defendants added nothing to the suit.
The plaintiffs appeal from the grant of
summary judgment to the defendants.

  The plaintiffs belonged to the Bible
Club at their school. In response to the
school's invitation to all student groups
to paint murals in the main hallway of
the school, the Club submitted a sketch
for a mural 4 feet by 5 feet depicting a
heart, two doves, an open Bible with a
well-known passage from the New Testament
(John 3:16: "For God so loved the world,
that he gave his only begotten Son, that

whosoever believeth in him should not perish, but have everlasting life"), and a large cross. The principal approved all but the cross. He was afraid that the inclusion of so salient a Christian symbol would invite a lawsuit against the school based on the establishment clause of the First Amendment and might also require him to approve murals of a Satanic or neo-Nazi character, which would cause an uproar. The school body includes adherents of both these unlovely creeds--and in fact the Bible Club's mural was defaced with a witchcraft symbol, and a group of skinheads unsuccessfully petitioned the principal to allow them to paint a mural containing a swastika. (According to a newspaper article in the record, the school has "active [white] supremacists enrolled there" and there have been racial incidents.) The principal had also forbidden mention of a specific brand of beer in the mural proposed by the Students Against Drunk Driving.

The plaintiffs complain not only about the excision of the cross from their mural but also about the principal's refusal to allow one of them to distribute unspecified religious literature schoolwide. In support of the first charge they cite the Equal Access Act, 20 U.S.C. sec. 4071(a). The Act forbids a school to deny equal access to its premises to a student group merely on the basis of the content (e.g., religious) of the speech at meetings of the group. The school could therefore not discriminate against the Bible Club merely because it is a religious rather than a secular association. Had the school, therefore, while permitting the Bible Club to meet on school premises, forbidden it to announce its meetings or otherwise compete on equal terms with comparable but nonreligious student groups, it would have violated the Act. Board of Education v. Mergens, 496 U.S. 226, 247 (1990); Pope by Pope v. East Brunswick Board of Education, 12 F.3d 1244, 1256 (3d Cir. 1993). But there is no evidence of discrimination against the Bible Club. The principal forbade the inclusion of a large cross in the Club's mural because he was afraid that it might invite a lawsuit (cf. Linnemeir v. Board of Trustees, 260 F.3d 757, 759 (7th Cir. 2001)) and incite ugly conflicts among the students. His reaction to the

swastika, and to the naming of a brand of beer, in proposed secular murals shows that he was discriminating not against religion but merely against displays, religious or secular, that he reasonably believed likely to lead to litigation or disorder. (The naming of a specific brand of beer in the mural of a student abstinence group might have encouraged students to show their defiance by getting drunk on it.)

The principal's decision to forbid the display of the cross was in any event insulated from liability under the Act by the provision that "nothing in [the Act] shall be construed to limit the authority of the school . . . to maintain order and discipline on school premises." 20 U.S.C. sec. 4071(f). It is true that to suppress expression on the basis of the angry reaction that it may generate is precisely what the "heckler's veto" cases, most famously Terminiello v. City of Chicago, 337 U.S. 1, 3-5 (1949), forbid in the name of the free-speech clause of the First Amendment. But the "order and discipline" defense that we just quoted suggests that the principle of those cases has not been carried over into the Equal Access Act. And anyway the First Amendment has been sensibly interpreted to allow school authorities greater control over the free speech of students than the state is permitted to exercise over the free speech of adults engaged in political expression in the normal venues. "A school need not tolerate student speech that is inconsistent with its 'basic educational mission' . . . even though the government could not censor similar speech outside the school." Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 266 (1988); see also Muller by Muller v. Jefferson Lighthouse School, 98 F.3d 1530, 1536-37 (7th Cir. 1996); Baxter by Baxter v. Vigo County School Corp., 26 F.3d 728, 737-38 (7th Cir. 1994). Order and discipline are part of any high school's basic educational mission; without them, there is no education.

The plaintiffs claim that the excision of the cross and the refusal to permit distribution of religious literature also interfered with the free exercise of their religion, in violation of the religion clauses of the First Amendment as interpreted in such cases as Good News

Club v. Milford Central School, 121 S. Ct. 2093, 2100-02 (2001). We shall not have to reach the merits of that claim, which anyway seem dim, at least so far as the excision of the cross is concerned (the refusal to permit the plaintiffs to distribute religious literature was challenged only under the First Amendment, and not under the Equal Access Act as well); we shall not conceal our doubts that the First Amendment has a broader scope than the Equal Access Act, Hsu By and Through Hsu v. Roslyn Union Free School District No. 3, 85 F.3d 839, 870 and n. 30 (2d Cir. 1996), although the Supreme Court has reserved the issue. Board of Education v. Mergens, supra, 496 U.S. at 247; see also Ceniceros By and Through Risser v. Board of Trustees, 106 F.3d 878, 881 n. 3 (9th Cir. 1997).

The procedural vehicle for the constitutional claim is 42 U.S.C. sec. 1983, and an initial puzzle is why the plaintiffs did not sue the individual defendants in their individual capacities, where they would not face the Monell issue that we discuss below and show is fatal to the claim regardless of the claim's merits. We did not obtain a satisfactory response when we asked this question of the plaintiffs' lawyer at oral argument.

We pause here to express our doubts about the appropriateness of litigation that is intended, whether by the friends of religion or by its enemies, to wrest the day-to-day control of our troubled public schools from school administrators and hand it over to judges and jurors who lack both knowledge of and responsibility for the operation of the public schools. The plaintiffs' high school is an urban school with 2000 students and 42 student groups. The regulatory and disciplinary problems implied by these numbers are formidable. In her diary, which is part of the record, plaintiff Gernetzke wrote: "[T]here's something exciting[:] I'm suing Kenosha Unified School District #1 . . . . The law suit is getting very interesting. KUSD is getting themselves deeper in cow dung than what they realize!" Do we really need this?

Monell v. Department of Social Services, 436 U.S. 658, 690, 694 (1978), holds that the doctrine of respondeat superior may not be used to fasten liability on a

local government in a suit under section 1983. See also Cornfield by Lewis v. Con solidated High School District No. 230, 991 F.2d 1316, 1324 (7th Cir. 1993). The predominant though not unanimous view is that Monell's holding applies regardless of the nature of the relief sought. Compare, e.g., Greensboro Professional Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962, 967 n. 6 (4th Cir. 1995), and Church v. City of Huntsville, 30 F.3d 1332, 1347 (11th Cir. 1994), with Chaloux v. Killeen, 886 F.2d 247, 250-51 (9th Cir. 1989); see also Reynolds v. Giuliani, 118 F. Supp. 2d 352, 363 (S.D.N.Y. 2000). We need not take sides in this case, since the plaintiffs do not argue that Monell is applicable only to their damages claim.

Respondeat superior is of course the judge-made doctrine, applicable to most tort cases but not to section 1983 cases, that makes an employer liable even if faultless for the torts its employees commit in the course of their employment. So the plaintiffs in this case cannot prevail against the school district by showing merely that the superintendent of the district and the principal of their school, acting within the scope of these officials' employment and therefore under color of state law, deprived the plaintiffs of religious liberty. They must show that the district itself, which is to say the officials or official boards that constitute the relevant final decisionmaking authority (legislative or executive) within the district, was directly responsible for the deprivation. McMillian v. Monroe County, 520 U.S. 781, 784-85 (1997); Horwitz v. Board of Education, 260 F.3d 602, 619 (7th Cir. 2001); Baskin v. City of Des Plaines, 138 F.3d 701, 705 (7th Cir. 1998).

This standard for municipal liability is often referred to as liability for "policy or custom," after language in Monell v. Department of Social Services, supra, 436 U.S. at 694. And also tracking language in Monell courts often refer to the municipality's final decisionmaking authority as its "final policymaking authority." E.g., Baskin v. City of Des Plaines, supra, 138 F.3d at 705. These usages are potentially misleading. It doesn't matter what form the action of the responsible authority that injures the plaintiff takes. It might be an

ordinance, a regulation, an executive policy, or an executive act (such as firing the plaintiff). The question is whether the promulgator, or the actor, as the case may be--in other words, the decisionmaker--was at the apex of authority for the action in question. See, e.g., Eversole v. Steele, 59 F.3d 710, 716 (7th Cir. 1995). An executive official who rather than making policy merely implements legislative policy acts merely as a delegate of the legislature, and his act is therefore not the act of the municipality itself for purposes of liability under section 1983. Auriemma v. Rice, 957 F.2d 397 (7th Cir. 1992).

The bearing of delegation on the principle of Monell turns out to be critical in this case. The final decisionmaking authority of the school district is lodged in the district's school board, but the board has promulgated regulations that delegate the administration of the five high schools in the school district to the principal of each school. This delegation, the plaintiffs argue, makes the principal the final decisionmaker so far as the mural and the request to be allowed to distribute literature are concerned. That cannot be right. It would collapse direct and derivative liability. Every public employee, including the policeman on the beat and the teacher in the public school, exercises authority ultimately delegated to him or her by their public employer's supreme governing organs. A police officer has authority to arrest, and that authority is "final" in the practical sense that he doesn't have to consult anyone before making an arrest; likewise a teacher does not have to consult anyone before flunking a student. That is a perfectly good use of the word "final" in ordinary conversation but it does not fit the cases; for if a police department or a school district were liable for employees' actions that it authorized but did not direct, we would be back in the world of respondeat superior. To avoid this the cases limit municipal liability under section 1983 to situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority. Partee v. Metropolitan School District, 954 F.2d 454, 456 (7th Cir. 1992); Beattie v.

Madison County School District, 254 F.3d 595, 603 (5th Cir. 2001). School superintendents, principals, and teachers in Wisconsin do not have final authority in this sense, Wis. Stat. sec. 120.13(b)(1); cf. Horwitz v. Board of Education, supra, 260 F.3d at 619; Duda v. Board of Education, 133 F.3d 1054, 1061 (7th Cir. 1998); Cornfield by Lewis v. Consolidated High School District No. 230, supra, 991 F.2d at 1325-26, as they would if theWisconsin legislature had vested the authority to make all decisions concerning school administration in them rather than in the school boards. Delegation is not direction; authorization is not command; permission does not constitute the permittee the final policymaking authority. City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988) (plurality opinion); Brown v. Neumann, 188 F.3d 1289, 1290 (11th Cir. 1999) (per curiam). Only the delegation ("conferral" would be a better term) of final authority makes the "delegate" the final authority. City of St. Louis v. Praprotnik, supra, 485 U.S. at 126-27; Cornfield by Lewis v. Consolidated High School District No. 230, supra, 991 F.2d at 1325; Ware v. Unified School District No. 492, 902 F.2d 815, 818-19 (10th Cir. 1990).

It is true that by adopting an employee's action as its own (what is called "ratification"), a public employer becomes the author of the action for purposes of liability under section 1983. Kujawski v. Board of Commissioners, 183 F.3d 734, 737 (7th Cir. 1999); Baskin v. City of Des Plaines, supra, 138 F.3d at 705; Hyland v. Wonder, 117 F.3d 405, 416 (9th Cir. 1997). This is not a legal fiction, at least in the bad sense of that term, but merely recognition that direction and approval do not differ practically. The plaintiffs argue that ratification occurred here when after they brought this suit the school board refused to direct the principal of their school to alter his response to their demand. The argument if accepted would convert every public employee's action that a plaintiff wished to challenge into the action of the employer. City of Canton v. Harris, 489 U.S. 378, 391-92 (1989); Cygnar v. City of Chicago, 865 F.2d 827, 847 (7th Cir. 1989); Soderbeck v. Burnett County, 752 F.2d 285, 293 (7th

Cir. 1985); Crowley v. Prince George's County, 890 F.2d 683, 687 (4th Cir. 1989); see also Smith v. Chicago School Reform Board of Trustees, 165 F.3d 1142, 1149 (7th Cir. 1999); Jones v. City of Chicago, 787 F.2d 200, 204-05 (7th Cir. 1986). From the plaintiff's standpoint it would be a case of "heads I win, tails you lose." The plaintiff would ask the employer for relief and if the employer granted it would not have to sue, while the employer who refused to grant the relief requested would be punished by being deemed to consent to the application of the doctrine of respondeat superior. Deliberate inaction might be convincing evidence of delegation of final decisionmaking authority, or of ratification, cf. Jones v. City of Chicago, supra, 787 F.2d at 204-05, but there is no evidence of that here.

Affirmed.