In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-1608

E.D., a minor, by her parent and next friend, LISA DUELL, *et al*.

*Plaintiffs- Appellants*,

*v.*

NOBLESVILLE SCHOOL DISTRICT, *et al*.

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:21-cv-03075-SEB-TAB — **Sarah Evans Barker**, *District Judge.*

ARGUED OCTOBER 29, 2024 — DECIDED AUGUST 14, 2025

Before EASTERBROOK, JACKSON-AKIWUMI, and MALDONADO, *Circuit Judges*.

MALDONADO, *Circuit Judge*. E.D. came to Noblesville High School intent on starting a pro-life student club. The school made it happen. Administrators explained the process, approved the club within weeks, and gave her a table at the activities fair where she wore a pro-life shirt and displayed pro-life signs while recruiting more than thirty members.

The trouble began when E.D. submitted flyers with political slogans and images for posting on the school's walls. Administrators told her—multiple times—to revise them to comply with the school's neutral content rules for all student-club wall postings. Instead, she brought her mother to meet with another administrator to press for approval, an attempted end-run around the officials who had already rejected the flyers. Concerned that the club was no longer student-led and that E.D. had violated established procedures, the principal suspended the club's status for the remainder of the semester. The principal stated that E.D. could reapply for recognition a few months later; she did so, and the club has remained active since.

E.D., through her parents Michael and Lisa Duell, sued the school district and several officials, claiming the rejection of her flyers and the club's suspension were driven by hostility to her pro-life views, in violation of the First Amendment and the Equal Access Act, 20 U.S.C. § 4071(a). The district court disagreed and granted summary judgment to the defendants.

We affirm. The record shows that school officials approved E.D.'s club, reasonably accommodated her speech, and suspended the club only for neutral, conduct-related reasons.

## BACKGROUND

The following facts are undisputed unless otherwise noted and are presented in the light most favorable to the Duells. *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 708 (7th Cir. 2017).

## I. Facts

In the summer of 2021, before beginning her freshman year at Noblesville High School (NHS), E.D. contacted school

administrators to ask how she could form a student club focused on pro-life advocacy. She was promptly told that to form a student interest club—a category reserved for student-initiated, student-led groups—she would need to find a faculty sponsor and complete a brief questionnaire describing the club's mission and activities. With student interest clubs, faculty sponsors supervise the use of school facilities and provide logistical support. Dr. Craig McCaffrey, NHS's principal, reviewed questionnaire responses and approved student interest clubs.

On August 3, the second day of the school year, E.D. met with Principal McCaffrey to discuss next steps after she successfully secured a faculty sponsor. E.D.'s mother, Lisa Duell, also attended the meeting. During the meeting, E.D. explained that she wanted to start a group called Noblesville Students for Life (NSFL) to educate peers on abortion and promote pro-life events. E.D. led the conversation, though her mother chimed in with several logistical questions and also recorded the meeting. McCaffrey was supportive. He gave E.D. a copy of the required club questionnaire and told her that submission of the form was the only step remaining before the club could be approved.

Within a few weeks, E.D. submitted the completed questionnaire, Principal McCaffrey approved the club, and E.D. represented NSFL at the fall activities fair. At her table, she displayed a tri-fold board with the club's mission statement, a sign reading "I Am the Pro-Life Generation," and wore a t-shirt with the same phrase. More than 30 students signed up to participate.

After the fair, E.D. met with Assistant Principal Janae Mobley to discuss scheduling the club's first meeting and

posting flyers to advertise it. At the time, NHS had no formal
written policy governing the content of flyers for student in-
terest clubs, beyond the general guidance in the 2021–2022
NHS Student Handbook. The handbook stated that flyers
must be posted only in designated areas and must be taken
down after the event date. It also required that all posters ei-
ther promote a school-sponsored event or have administra-
tive approval. NHS officials testified that, in practice, admin-
istrators expected student club flyers to include only the
club's name and the meeting's time, date, and location, and to
exclude any "disruptive" or "political" content. In addition,
all flyers had to be approved in advance, include a written
take-down date, and bear the initials of the administrator who
approved them.

E.D. emailed Mobley two flyer templates she had obtained
from Students for Life of America (SFLA), a national pro-life
organization. The proposed flyers had the headline, "Pro-Life
Students, It's Time to Meet Up!", followed by images of
young protestors holding signs reading "Defund Planned
Parenthood" and "I Am the Pro-Life Generation." Below the
images were spaces to fill in the club's meeting details.

 

The next day, Mobley emailed back that the flyers should include only the name of the club and the time, date, and location of the meeting and not include the pictures. As a point of comparison, she noted that NHS's Young Republicans Club did not use party logos or slogans on its flyers but only included meeting information. Mobley told E.D. that club members could, of course, make these very statements at their meetings, she just could not post them on the school's walls. That same day, Mobley emailed NSFL's faculty sponsor, Brian McCauley, and asked him to work with E.D. to revise the flyer.

McCauley and E.D. exchanged several emails over the following day. McCauley, whose role was to provide faculty support to E.D.'s effort, reiterated that the "best thing" was for the flyer to include only the club's name and meeting information, with "no pictures." E.D. initially responded that she had hoped to use the SFLA template, but after McCauley

again emphasized the guidelines, she replied: "Sounds good, thanks! I'll get to work on making the flyers." McCauley also advised her to contact Dean of Students Jeremy Luna to schedule NSFL's first meeting.

A couple days later, E.D. met with Luna, accompanied again by her mother. Despite her earlier agreement with McCauley, E.D. re-raised the issue of the flyer. Luna told them the flyer could not be approved because it included a political image and that the school was already walking "on egg-shells." Specifically, he explained that the flyer could not include the "Defund Planned Parenthood" sign and that a version without the image "should" or "would possibly work," but that approval was not ultimately his decision.

After the meeting, Luna debriefed with Principal McCaffrey and Assistant Principal Mobley and told them he thought the conversation had been driven primarily by E.D.'s mother. Mobley then explained to McCaffrey that E.D. had previously submitted the flyers to her, that she had rejected them, and that she had already explained what content was acceptable. Based on that email exchange, Mobley believed there was a plan in place to revise the flyers accordingly. But after E.D.'s mother re-appeared in the meeting with Luna, McCaffrey and Mobley voiced concerns with Luna about Mrs. Duell's leadership role in the club. Student clubs are supposed to be student-run.

On September 3, Principal McCaffrey suspended NSFL's status as an approved student interest club. He viewed E.D.'s effort to revisit the flyer issue with Luna—after having already received guidance from Assistant Principal Mobley and faculty sponsor McCauley—as an "attempt at insubordination led by an outside adult advocating with the student." In

McCaffrey's view, E.D. and her mother's attempted end-run around the problems with her flyers warranted discipline. He testified that the decision to suspend NSFL's club status was his alone, and that he did not inform Superintendent Beth Niedermeyer until after he issued his decision.

Principal McCaffrey sent an email to E.D.'s mother later that day explaining why he suspended NSFL's club status and outlining the school's process for student interest clubs. He noted that while it was "unusual and [un]orthodox" for Mrs. Duell to attend the initial meeting since student interest clubs are supposed to be "100% student driven and can have no involvement from any adult," he allowed it to proceed because E.D. had done the talking.

He then expressed confusion as to why E.D. and Mrs. Duell had approached another administrator about a flyer that had already been denied by the assistant principal. He reiterated that "posters cannot contain any content that is political or that could disrupt the school environment," and that flyers should "only state the name of the club and the details of the meeting time and location." Once the students actually meet, he wrote, they are free to "talk about their common interests." He stated that he was "no longer confident that th[e] club [wa]s student-driven" and was "removing the club's approval to meet in the school." He added that he was not accepting new club applications at the time due to a "revamp" of the process, but that E.D. could reapply in January.

E.D. resubmitted her application as instructed and Principal McCaffrey reinstated NSFL in January 2022.

**II.  Procedural History**

On appeal, the Duells press only a handful of the numerous claims they pleaded, each under 42 U.S.C. § 1983. First, they assert that Noblesville School District violated E.D.'s free speech rights by vetoing the pictures in her flyers. Second, they contend the District violated E.D.'s First Amendment rights again (both free speech and freedom of association) by suspending NSFL's club status. Third, they maintain that the District, Superintendent Niedermeyer, and Principal McCaffrey, retaliated against E.D., again in violation of the First Amendment, when they suspended NSFL's club status. Finally, they allege that the District, the same two officials, as well as Assistant Principal Mobley and Dean Luna, all violated the Equal Access Act, also based on the suspension of NSFL's club status.

On cross-motions for summary judgment, the district court ruled for the defendants on each claim. The Duells now appeal.

## DISCUSSION

We review the district court's grant of summary judgment de novo. *N.J. ex rel. Jacob v. Sonnabend*, 37 F.4th 412, 420 (7th Cir. 2022). On an appeal from cross-motions for summary judgment, we view the evidence and draw all reasonable inferences "in favor of the party against whom the motion under consideration [was] made." *Id.* (quoting *Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015)). "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017) (citation omitted).

## I. First Amendment Claims

Before turning to the merits, we note that the Duells bring the free speech and association claims solely against Noblesville School District and not against any of the individual defendants. Because the District is a municipal entity, liability under 42 U.S.C. § 1983 must meet the requirements of *Monell v. Department of Social Services*, 436 U.S. 658, 694–95 (1978). That is, the Duells must show not only a constitutional violation, but also that an official policy, a widespread practice, or a decision by a final policymaker caused the violation. *See First Midwest Bank, Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021).

The parties dispute not only whether any constitutional violations occurred, but also whether the District can be held liable under *Monell*. The district court resolved the claims against the District solely on *Monell* grounds and did not reach the underlying constitutional questions. We take the opposite approach: we do not address *Monell* liability and instead resolve the case on the merits.[1] *See LaPorta*, 988 F.3d at 987. We hold that the Duells have not established any constitutional violation—against the District or any individual official—an outcome that is dispositive regardless of *Monell* liability.

### A. Regulation of E.D.'s flyers

We begin with the Duells' claim that the District violated E.D.'s First Amendment right to free speech when it rejected the images on her proposed flyers. To assess that claim, we

---

[1] We may affirm summary judgment on any ground supported by the record. *Moore v. W. Ill. Corr. Ctr.*, 89 F.4th 582, 595 (7th Cir. 2023).

must first resolve a threshold issue: whether *Tinker v. Des Moines Independent Community School District,*, 393 U.S. 503 (1969) or *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988) supplies the governing standard.

### 1.  *Tinker* or *Kuhlmeier*

In *Tinker*, the Supreme Court struck a balance regarding student speech. It held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," but recognized that those rights are subject to the realities of the school environment. *Tinker*, 393 U.S. at 506. There, the Court struck down suspensions imposed on high school students for wearing black armbands to protest the Vietnam War, finding no evidence that the expression "would materially and substantially disrupt the work and discipline of the school"—the standard it established for evaluating school-based speech. *Id.* at 513–14.

Since *Tinker*, the Supreme Court has identified three different categories of student speech that public schools may regulate even absent a substantial disruption. *See Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187–88 (2021). Relevant here is the category addressed in *Kuhlmeier*: student speech that others "might reasonably perceive to bear the imprimatur of the school." 484 U.S. at 271. There, school officials removed two articles, one on student pregnancy and the other on the impact of divorce on students, from a school-sponsored newspaper produced as part of a high school journalism class. Applying First Amendment forum analysis, the Court held that school officials could "exercis[e] editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at

273. The Court distinguished *Tinker*, explaining that while *Tinker* concerned whether schools must tolerate private student speech, *Kuhlmeier* addressed whether they must affirmatively promote it. *Id.* at 270–71. Critically, the Court recognized that school-sponsored speech appears to bear the school's imprimatur, so schools must be able to assert greater authority over it. *Id.* at 271–72.

The Duells argue that *Tinker*'s substantial disruption standard governs because E.D.'s flyers represented her private student speech. The District counters that *Kuhlmeier*'s forum-analysis approach applies, given the school's central role in facilitating the flyers' placement on its walls. We agree that *Kuhlmeier* provides the appropriate framework.

Because of where and how E.D. sought to display her flyers, they could reasonably be perceived as bearing the school's imprimatur. If posted, the flyers would have appeared on school walls alongside announcements for school-sponsored events and remained in common areas for days. Untethered to any identifiable student and indistinguishable from official school materials, they would naturally (and perhaps inevitably) be seen by students, parents, and visitors as reflecting the school's endorsement. In fact, every student flyer in the school must bear a faculty member's initials for approval—a literal stamp of the school's authority. That risk of mistaken attribution is precisely the kind of institutional concern *Kuhlmeier* addresses. This is not a case about tolerating private student speech. To the contrary, E.D. was permitted to wear her pro-life shirt to school and hand out her flyers to students at the activities fair. Instead, it is a case about whether the school must lend its resources (here, literally its

walls)—and, by extension, its authority—to disseminate student messages. *See id.* at 271–72.

The Duells resist this conclusion, relying chiefly on Judge Rovner's concurring opinion in *Muller ex rel. Muller v. Jefferson Lighthouse School*, 98 F.3d 1530 (7th Cir. 1996), which was later endorsed by this Court in *N.J. ex rel. Jacob v. Sonnabend*, 37 F.4th 412, 425 (7th Cir. 2022). In *Muller*, an elementary school student was prohibited from distributing and posting flyers inviting classmates to a Bible study at his church. *Muller*, 98 F.3d at 1532. The majority applied *Kuhlmeier* and upheld the restriction. *Id.* at 1537. Judge Rovner agreed that the restriction did not violate the First Amendment but contended that *Tinker* instead applied. *Id.* at 1546. In *Sonnabend*, our Court expressly adopted the reasoning of that concurrence and overruled *Muller* to the extent it had "mistakenly applied *Kuhlmeier* and speech-forum analysis." 37 F.4th at 425.

But we held that principle to be limited to *Muller*'s facts. *Sonnabend* concluded that the flyers in *Muller*, which promoted an off-campus church event, could not reasonably be perceived as bearing the school's imprimatur. *Id.* As a result, *Kuhlmeier* did not apply; however, *Sonnabend* did not hold that *Tinker* governs all restrictions on posting student flyers. It simply reaffirmed that *Kuhlmeier* is limited to situations where student speech might reasonably be attributed to the school, which it found lacking in *Muller*.

This case is completely different. E.D.'s flyers did not advertise a private, off-campus event; they did the opposite. They promoted a club meeting during school hours, on school property, and under the supervision of a faculty advisor. Unlike *Muller*, where flyers were confined to a designated bulletin board for private, unsanctioned materials, *Muller*, 98 F.3d

at 1541, E.D.'s flyers would have been posted alongside official school-sponsored communications in high-traffic common areas throughout the school. In that setting, a reasonable observer could easily conclude that the flyers reflected the school's endorsement.

Accordingly, even under the *Muller* concurrence and *Sonnabend*, the proper inquiry remains whether the speech bears the school's imprimatur. Because E.D.'s flyers were closely tied to school resources and would appear on the school's walls largely indistinguishable from other school-sponsored postings, *Kuhlmeier* applies. That conclusion is also consistent with decisions from other circuits, which have applied *Kuhlmeier* to student speech displayed on school property that reasonably appears school-sanctioned. *See Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 924–26 (10th Cir. 2002); *Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1214 (11th Cir. 2004).[2]

### 2.  Application of *Kuhlmeier*

Applying *Kuhlmeier*, we now consider whether the school's restriction was "reasonably related to legitimate

---

[2] The Duells also argue that *Fujishima v. Bd. of Educ.*, 460 F.2d 1355 (7th Cir. 1972), requires us to invalidate the District's pre-approval flyer policy. There, under the prior-restraint doctrine, we struck down a rule that prohibited any person from distributing materials on school premises without prior approval from the superintendent. *Id.* at 1358–59. But *Fujishima* predates *Kuhlmeier*, which significantly reshaped the legal framework for student speech. *See Muller*, 98 F.3d at 1540 ("Prior restraint of student speech in a nonpublic forum is constitutional if reasonable."). In any event, *Fujishima* addressed a blanket restriction on distribution of materials, not a school's decision to control what may be posted on its own walls. That is a materially different question, and one *Fujishima* did not consider.

pedagogical concerns." 484 U.S. at 273. Under this standard, schools may regulate student expression in school-sponsored forums so long as their actions are tied to a valid educational purpose. *Id.* The Supreme Court has "cautioned courts … to resist substituting their own notions of sound educational policy for those of the school authorities which they review." *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 686 (2010) (citation modified). "[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Kuhlmeier*, 484 U.S. at 273. We conclude that the District's decision to prohibit E.D.'s flyers satisfies that standard and did not violate the First Amendment.

The District's restriction on political content in student flyers is reasonably related to legitimate pedagogical concerns. The school designated its walls as a limited public forum for the narrow purpose of allowing student clubs to advertise only meeting times and locations. In keeping with that purpose, the District may impose reasonable limitations to preserve the forum's intended function. *See id.* at 269–70. That includes requiring preapproval of flyers and restricting messaging to basic club information. Excluding political content, in particular, serves the pedagogical goal of maintaining neutrality on matters of political controversy. Schools must "retain the authority to refuse to sponsor student speech that might reasonably be perceived to … associate the school with any position other than neutrality on matters of political controversy." *Id.* at 272. Flyers promoting a polarizing political slogan ("Defund Planned Parenthood") and bearing an administrator's initials alongside school-sponsored postings could mislead observers into thinking the school endorses that view. The potential for such misunderstanding—and for

disruption—is greater here than in *Kuhlmeier*, where the disputed student articles addressed pregnancy and divorce. That concern with disruption is itself part of the school's broader pedagogical mission. "Order and discipline are part of any high school's basic educational mission; without them, there is no education." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 467 (7th Cir. 2001). The District could reasonably conclude that covering its walls with warring political messages would undermine that order and divert attention from the business of learning.

In short, the District's content restriction aligns with both the nature of the school walls as a limited forum for student expression and its broader pedagogical duty to create a stable, neutral educational environment. It passes constitutional muster under *Kuhlmeier*.

The Duells see it differently. They argue that the District's restriction on political content suppresses the very kind of robust debate secondary schools should encourage. But this dramatically overstates both the scope and effect of the District's policy. Recall that E.D. was permitted to form NSLF, promote it at the student activities fair, and distribute materials without limitation on what she could wear, say, or hand out. She is free to express her views and engage in debate during club meetings and elsewhere on campus. The "no political message" restriction applies only to the use of school walls to post flyers, not to students' broader right to express political opinions. The rule merely limits how certain messages may be disseminated, not whether they may be expressed at all. That distinction matters. So long as the restriction is tied to the purpose of the forum—and here, it plainly is—it satisfies *Kuhlmeier*'s standard.

The Duells also cite to *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018), arguing that the District's restriction on "political" content is too vague to be enforced fairly. *See id.* at 16–17. But *Mansky* is both factually and legally distinguishable. First, *Mansky* did not involve student speech or schools at all. It involved a polling place, which is an entirely different constitutional context where political neutrality is required for constitutional reasons. *Cf. Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("[T]he political franchise of voting … is … a fundamental political right, because [it is] preservative of all rights."). By contrast, schools have broader authority to restrict speech that may be perceived as bearing the school's imprimatur or undermining the learning environment. *See Kuhlmeier*, 484 U.S. at 271–72.

Second, even if *Mansky*'s standards apply, they are satisfied. *See Mansky*, 585 U.S. at 16 (requiring "some sensible basis" for a rule limiting "political" messaging at polling places). The flyer policy gives administrators sufficient guidance to make reasoned decisions: flyers may contain the club's name and meeting information, but no political messaging. *See Muller*, 98 F.3d at 1541 ("The Supreme Court has never held that a detailed administrative code is required before student speech may be regulated."). The risks of arbitrary enforcement that were dispositive in *Mansky* are simply not present.

Finally, the Duells argue that the school rejected E.D.'s flyers because of their pro-life message, amounting to impermissible viewpoint discrimination. Courts are divided over whether *Kuhlmeier* requires viewpoint neutrality in school-sponsored speech. *See Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (noting circuit split). We have yet to rule on the issue, and we need not do so now

because the Duells offer no evidence that E.D.'s flyers were rejected because of the views they expressed.

The flyer policy is viewpoint neutral both on its face and in its application. Under the handbook, all flyers for non–school-sponsored events must receive prior administrative approval, regardless of the views expressed. As noted, administrators also enforced a rule limiting club flyers to basic content—the club's name and meeting details—while excluding any material "political in nature." This restriction regulates content, not viewpoint. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995) (distinguishing content-based from viewpoint-based restrictions).

School officials also applied the policy evenhandedly. According to undisputed testimony, the rule equally prohibits all clubs from including political content on flyers beyond the club name. The same rule barred any group from promoting pro-choice messaging or using political images. Nothing in the record suggests that officials treated E.D.'s flyers differently because of their pro-life perspective. To the contrary, the policy disallowed political messages of any kind, from any speaker. *Cf. Choose Life Ill., Inc. v. White*, 547 F.3d 853, 866 (7th Cir. 2008) (upholding viewpoint-neutral restriction on abortion-related license plates).

The Duells point to no example of an approved flyer with opposing political content. Their only reference involves a flyer posted by the Black Student Union featuring an image of three raised fists. But that issue was raised only in passing at oral argument and does not appear in their appellate briefing. It is therefore waived. *Roberts v. Columbia Coll. Chicago*, 821 F.3d 855, 862 n.2 (7th Cir. 2016) (arguments not preserved in briefing are waived).

Even setting waiver aside, the argument fails. The Duells offer no evidence that school officials ever even approved the Black Student Union flyer. Assistant Principal Mobley testified only that she "possibly" saw it posted, but she neither approved it nor remembered when or where she saw it. The flyer also lacked the required administrator initials and takedown date, further suggesting that it was never officially approved. At oral argument, the Duells suggested that the flyer's presence on the school walls implies approval. But speculation is insufficient to survive summary judgment. *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024). At most, the record shows that one unauthorized flyer may have been posted at some point. That isolated fact does not create a triable issue as to whether administrators applied the content policy in a discriminatory or inconsistent manner.

Nor do the comments of any NHS staff support an inference of viewpoint discrimination. Administrators consistently told E.D. that club flyers must include only basic logistical information. Nothing suggested that her flyers were rejected because of their message. Mobley explained that other clubs followed the same rules. Luna and Principal McCaffrey both testified that no club was permitted to include political content. The Duells cite Luna's remark that the school was already walking "on eggshells" and McCaffrey's email saying that the flyers were "not appropriate for school due to the content." But these statements, in context, reflect concern over compliance with the content-neutral policy, not hostility toward E.D.'s viewpoint. In fact, Mobley, Luna, and McCaffrey each testified that they personally agreed with E.D.'s pro-life views. Their personal beliefs, while not dispositive, make it especially difficult to infer discrimination based on viewpoint.

The record, taken as a whole, reflects a consistently enforced policy applied equally to all viewpoints. No reasonable jury could conclude otherwise. The Duells have not identified a single instance in which the school approved a flyer with political content to be posted while denying E.D.'s because of its message. The policy is facially neutral, and the evidence confirms that it was applied without regard to viewpoint.

## B. Suspension of NSFL's club status

We next consider the Duells' claim that the District violated E.D.'s free speech and association rights when Principal McCaffrey suspended NSFL's status as an approved student interest club. The parties agree that the Supreme Court's limited-public-forum precedent governs. "[A] limited public forum … is a place the government has opened only for specific purposes or subjects." *Milestone v. City of Monroe*, 665 F.3d 774, 783 n.3 (7th Cir. 2011). Speech restrictions in limited public fora must be "reasonable in light of the purpose served by the forum" and "viewpoint neutral." *Martinez*, 561 U.S. at 685, 690 (citations omitted). When dealing with limited public fora in schools, courts proceed "with special caution," recognizing that schools "enjoy … a significant measure of authority over the type of officially recognized activities in which their students participate." *Id.* at 686–87 (citations omitted). Applying those principles, we conclude that the suspension of NSFL's club status was constitutionally permissible.

The District reasonably applied its generally applicable rules when it suspended NSFL's club status. The purpose of NHS's student-interest-club forum is to facilitate extracurricular opportunities that are entirely student-led and student-run. That structure serves legitimate pedagogical goals: it fosters student initiative, prevents outside domination of the

forum, and keeps the school's resources directed toward student-driven activities. McCaffrey reasonably concluded that NSFL was not adhering to this requirement. After approving the club with full knowledge of its pro-life mission, he learned that E.D. and her mother attempted to game the system, seeking approval from another administrator for their template flyer with an explicitly political message after it had already been rejected. Luna reported that Mrs. Duell—not E.D.—led that conversation. In McCaffrey's view, this was contrary to the basic premise of "student run" clubs.

In addition, the family's approach to the flyer issue reflected noncompliance with the procedural rules governing the forum. Administrators, including the faculty sponsor who supported the club, had instructed E.D. to revise the flyer to remove prohibited political images before resubmitting it for approval and she agreed at first (i.e., "Sounds good."). But then with her mother accompanying her, she later sought approval from another administrator without making the required changes. The school may insist that recognized student groups adhere to school rules and procedures, including "reasonable standards respecting conduct." *Healy v. James*, 408 U.S. 169, 193 (1972). Nothing in the record suggests that McCaffrey's response was disproportionate—particularly given that the suspension was temporary, with a reasoned explanation, and with a defined opportunity to reapply.

The undisputed evidence also shows that McCaffrey's decision to suspend the club was not motivated by disagreement with E.D.'s pro-life views. He approved NSFL knowing its mission, permitted E.D. to promote it at the activities fair wearing pro-life slogans and distributing pro-life materials, and reinstated the club a few months later with the same

mission intact. Those actions are inconsistent with any intent to suppress E.D.'s views. Instead, McCaffrey consistently identified two neutral grounds for his decision: the involvement of Mrs. Duell in what must be a student-run process, and E.D.'s perceived insubordination in trying to obtain permission to post her already-rejected flyer. Those reasons apply regardless of the content of the club's advocacy: they "draw[] no distinction between groups based on their message or perspective." *Martinez*, 561 U.S. at 694. The record contains no example of another club being allowed to circumvent the student-led requirement or flyer rules based on the message it sought to promote.

The Duells nonetheless argue that the temporal proximity between the flyers incident and McCaffrey's suspension decision suggests that suppressing her speech was the true motive at work. But "suspicious timing alone [is] rarely [] sufficient to create a triable issue." *Manuel v. Nalley*, 966 F.3d 678, 681 (7th Cir. 2020) (citation modified). And, regardless, the timing of the decision supports rather than undermines McCaffrey's stated reasoning. He allowed the club to form knowing its pro-life mission and permitted it to operate for a month. He acted only after E.D. and her mother's meeting with Luna to revisit the flyer issue that had already been addressed. He reasonably viewed this conduct as inconsistent with the forum's student-led requirement and the posting rules.

On this record, McCaffrey's suspension of NSFL's club status was reasonable in light of the forum's purpose and was based on concerns wholly unrelated to E.D.'s viewpoint. The Duells' speech and association claims based on the suspension therefore fail.

Likewise, the First Amendment retaliation claim also fails because McCaffrey acted on viewpoint-neutral, forum-related concerns rather than in response to E.D.'s speech. To prevail, the Duells had to show that E.D.'s protected expression was "a motivating factor" in McCaffrey's decision to suspend NSFL's club status. *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) (citation omitted). The record does not permit that inference. As explained, McCaffrey approved NSFL knowing its pro-life mission, suspended its status only after learning of conduct he viewed as inconsistent with the student-led requirement, and promptly reinstated the club at the first available opportunity. No reasonable jury could find that E.D.'s protected expression was a motivating factor in his decision.[3]

## II.  Equal Access Act Claims

Finally, we address the Duells' claims under the Equal Access Act. The Act prohibits a public secondary school that receives federal funding and maintains a limited open forum from denying "equal access or a fair opportunity to, or discriminat[ing] against, any students who wish to conduct a meeting within [any] limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a). E.D. advances two theories: first, that the suspension of NSFL's club status violated the Act; and second, that the denial of her flyers

---

[3] The Duells also bring retaliation claims against Superintendent Niedermeyer and Principal McCaffrey in their individual capacities. Those claims also fail because there was no First Amendment retaliation in the first instance. McCaffrey alone made the suspension decision, and Niedermeyer had no role in it so any potential supervisory claim against her falls flat at the start.

constituted a separate violation. Both fail—the former on the merits, and the latter for lack of preservation.

The Act requires proof that the school acted "on the basis of" the content of the speech at the meeting in question. *See Gernetzke*, 274 F.3d at 466. For reasons already discussed ad nauseum, the record forecloses that inference. Principal McCaffrey suspended NSFL's status because he believed the club was run in part by Mrs. Duell in violation of the forum's rules, and because E.D. attempted to circumvent uniform flyer restrictions by seeking approval from another administrator after her proposal had already been rejected, conduct he viewed as insubordinate. His decision was not tied to the club's pro-life mission. The absence of content-based causation defeats the claim against McCaffrey and, by extension, the District. *See id.* at 466–67. It also forecloses the claim against Niedermeyer, Mobley, and Luna, none of whom played any role in the suspension decision. Because McCaffrey's decision did not violate the Act, no other defendant can be liable.

The Duells' alternative theory, that the denial of E.D.'s flyers independently violated the Act was not preserved in the district court. The Southern District of Indiana's local rules require the parties to submit a case management plan identifying "a statement of [the] plaintiff's claims" they intend to prove at trial, including "the legal theories and facts" supporting each claim. S.D. Ind. Uniform Case Management Plan for Civil Cases; *see* S.D. Ind. L.R. 16-1. The Duells' submission defined E.D.'s Equal Access Act claim solely as a denial of the right to "conduct meetings" due to the content of her speech. Nothing in their Local Rule 16 statement (or in their amended

complaint) suggested that the claim also encompassed a right to post flyers under the Act.

The Duells advanced this new theory for the first time in their summary judgment briefing. The district court therefore declined to consider it, finding that it exceeded the scope of the Equal Access Act claim as preserved in the statement of claims and in the pleadings. We review the enforcement of local rules for abuse of discretion, keeping in mind "that district courts may require strict compliance with their local rules." *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 528 (7th Cir. 2020) (collecting cases). We find that the district court acted well within its discretion.

District courts may require parties to define their claims and theories in advance of summary judgment, and they may hold parties to those definitions. *See Elizarri v. Sheriff of Cook Cnty.*, 901 F.3d 787, 790–91 (7th Cir. 2018); *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 628–29 (7th Cir. 2013). Several of the Duells' other claims in the same Local Rule 16 statement expressly referenced the posting of flyers, underscoring that they knew how to identify such a theory when they wished to do so. The district court reasonably concluded that the Equal Access Act claim was confined to the suspension of NSFL's status and that the flyer-based theory, raised for the first time at summary judgment, was not properly before the court.

## CONCLUSION

For all the forgoing reasons, we AFFIRM the judgment of the district court.